# Prudential Insurance Company of America v. Tuggle's Administrator.

(Decided March 23, 1934.)

(As Modified on Denial of Rehearing June 26, 1934.)

LOW & BRYANT and FAULKNER & FAULKNER for appellant.
CRAFT & STANFILL for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

The appellant seeks to reverse a judgment for $1,000 recovered against it by the appellee upon an insurance contract for the alleged accidental death of his intestate.

Ivan Tuggle was an employee of the Louisville & Nashville Railroad Company at the time of his death. He was a locomotive fireman having been demoted from engineer, doubtless due to reduction in forces as a result of the depression. The railroad company was carrying a group insurance policy for the benefit of its employees. The decedent was protected by this insurance, which provided for the payment of a death benefit of $3,000 which has been paid, and provided further, in the event the death was the result of an accident, as defined in the policy, for an additional benefit of $1,000.

The decedent died instantly from the effect of a gunshot wound on the 7th day of September, 1931. This tragedy occurred under the floor of the house where the decedent lived about 10:30 o'clock a. m. on that day. The house was built on a steep hillside, and the natural surface never had been disturbed. Consequently the lower side of the house was considerably above the ground, and the surface sloped upward at an angle of about forty-five degrees. The house was supported by a concrete foundation, and there was a door leading under the house at the lower side considerably toward the rear of the house. Coal and kindling were kept under there, and it was a dark and uninviting place. The public school in Hazard opened the morning of the tragedy, and the children of the community had gone to school. The appellee claims that the tragedy was an accident and that the decedent's death was the result of accidental means as defined by the policy, which appellant denies, and as an additional defense it alleges that he committed suicide.

The policy is not before us. A master policy No. G1788 was issued, and that, it is alleged, is in the hands

of the Louisville & Nashville Railroad Company. Certificates were issued to the railroad's various employees, and to Tuggle there was issued certificate No. 62485, but even that is not here, so we must gather the provisions of this contract from the pleadings. The following undenied allegation is copied from appellant's answer:

"The defendant says that in and by the terms of the said group insurance policy it is provided that no accidental death benefits shall be payable if such death resulted from suicide—whether the insured should be sane or insane."

That must be taken as the part of the contract that is determinative of the rights of these parties, and the issue was whether Tuggle died from accident as alleged by appellee or committed suicide as alleged by appellant.

There is evidence that the deceased was generally even tempered and very friendly; that he was a jolly, friendly fellow, and seldom angry; that ordinarily he had a smile for everybody; that he had a good position, and had a family to which he was devoted, and appellee had much evidence he was happily situated. Even so, he had been acting queerly. He had lain out some place all the night before the tragedy. His wife became alarmed during the night, and about 12:30 or 1 o'clock made inquiry about him of a neighbor, Mrs. Creola Barnett. Mrs. Barnett saw him next morning a short time before the tragedy. She asked him, "Did you get your neck broke last night?" He answered that he had "laid out last night." About ten days before the tragedy the witness, Russell Eaton, passed him on the street, spoke to him and passed the time of day with him, but he passed on and disregarded the witness. They were well acquainted, and the deceased seemed to be in a study or troubled about something. The witness, Felix Gilbert, operated a restaurant near the railroad yards. About a week or ten days before the tragedy the deceased went to the restaurant and ordered a dinner. He stated that he was hungry and had stayed at home until dinner was ready and then got mad and came off without his dinner. These facts are an indication of the change that had come over the deceased during a short time before the tragedy. These facts show a radical change in his disposition. One of the witnesses who had worked with him stated that he seldom became angry, but we find him getting so mad that he left a dinner at home

and ate at a restaurant. This was only a week or ten days before the tragedy.

The evidence unmistakably shows that the place of the tragedy was dark and uninviting. It was so dark under there that one of the witnesses nearly stumbled over the body before he discovered it. They struck matches and used flashlights in finding their way to where the body was found and in making their obser-vations. There was in this basement a steel barrel or drum standing on end against the concrete wall at the lower side and between the door leading under the house and the street. Appellant claims that the deceased be-came disgusted with things for some reason and took his gun and went to this basement for the deliberate pur-pose of committing suicide. The arms of the deceased were long enough to permit him to rest his gun across this barrel, to place the muzzle of the gun against the side of his head, and then reach back and trip off the trigger with his left hand.

The bullet entered the left side of his head near his ear and passed through and came out at the top of his head. There was no powder burn on the side of his head; the gun was lying across the top of the barrel at the time it was discharged. A mark on the concrete wall indicated where, due to the recoil, the gun struck when it was discharged. The bullet entered the oppo-site bank in the line with the gun in the position we have indicated and was recovered in the presence of several persons. The only explanation we can see of the fact that the deceased was shot through his head as we have indicated is that he knelt, squatted, or hunkered down in front of the gun and deliberately committed suicide. The evidence shows without contradiction that under such facts there would be no powder burns. It seems that where the muzzle of a gun is held against the flesh and fired, the smoke and flame follow the ball into the wound. See Epperson v. Com., 227 Ky. 404, 13 S. W. (2d) 247. There were blood and brains on the inside of the muzzle of the barrel due to "back suction" after the gun was discharged with the muzzle pressed against the side of the head. This was a Springfield army rifle, a powerful gun; a copper-jacketed 30-30 bullet was used. The gun had a range of over a mile and a half. The effect of the shot was to completely crush the head and to cause immediate death. These are most unusual circumstances to reconcile with the theory of acci-

dental death. In the first place, there is no apparent reason why he should have had the gun in such a place. He did not drop it, for it was carefully placed on top of the barrel. He had to be kneeling, squatting, or hunkering down for the bullet to strike him in the head. If he had been a little way from the muzzle of the gun, there certainly would have been no back suction of brains and blood into the end of the gun barrel, and there probably would have been powder burn. The most logical explanation of this strange set of facts is that he took the gun under there to commit suicide; that, after placing the gun on the barrel, he placed himself at the muzzle in a kneeling or squatting position with the end of the gun barrel against the side of his head. Then, by stretching in order to reach the trigger, he would necessarily tilt his head so the bullet would pass through and out at the top of his head. No other explanation is consistent with the facts.

Appellant insists it was entitled to a directed verdict. In determining that we must take into consideration the presumption against suicide and the fact that by section 2062a-21, Ky. Stats., the copy of the death certificate filed is made prima facie evidence of the facts therein stated, and in this case it is stated Tuggle's death was the result of an accidental gunshot wound. Conceding but not deciding that it was competent for this certificate to contain such a statement, then its prima facie evidence effect is nothing more than a presumption. In this case, if no other evidence had been introduced, either of these presumptions would have been enough to require the giving of a directed verdict for the appellee, thus each of them has some weight, but how much? A fleck of eiderdown has some weight, yet it is so inconsiderable that, just as soon as almost any material thing is placed upon the opposing scale pan, the scale is tipped, and just so in this case the scale was tipped by the first substantive evidence for the appellant, though the idea is very prevalent that, when a litigant by evidence puts himself in a position where by some statute that position is said to be prima facie established, his position is as secure as if it had a stone wall built about it, yet such is not the case.

A man concealed by an enshrouding fog is just as securely protected from enemies by whom he is beprima facie case. The one's protection is destroyed. leaguered as the man who has made no more than a

and he is left exposed and helpless when the rays of the sun or the winds scatter the fog, and the other finds his prima facie case destroyed by the first breath of substantive evidence against him.

Presumptions are indulged in to supply facts, and do not arise where the facts are known. 22 C. J. p. 83, sec. 25. Ordinarily, presumptions must give place when in conflict with clear, distinct, and convincing proof. 10 R. C. L. p. 868, sec. 10. In Jones on Evidence (2d Ed.) sec. 32, it is thus stated:

> "Presumptions are only intended to take the place of facts and cannot be relied upon where the facts are shown; or that no presumption can stand in the face of facts. According to such authorities a presumption is an artificial thing, a mere house of cards, which one moment stands with sufficient force to determine an issue, but at the next, by reason of the slightest rebutting evidence, topples utterly out of consideration of the trier of facts."

This is taken from Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S. W. 45, 50, 7 A. L. R. page 1213 (a suicide case):

> "Presumptions are the bats of the law, which the light of evidence frightens and causes to fly away. Mockowik v. Kansas City, St. J. & C. B. R. Co., 196 Mo. 550, loc. cit. 571, 94 S. W. 256."

As to the contents of the death certfiicate, the rule is not different, as will appear from this which is taken from Jones on Evidence (2d Ed.) sec. 509:

> "Prima facie evidence in legal intendment means evidence which if unrebutted or unexplained is sufficient to maintain the proposition, and warrant the conclusion to support which it has been introduced but it does not shift the general burden of proof, and stands only until the contrary is shown."

For example, see Federal Fidelity Co. v. Royal Mortgage & Finance Co., 252 Ky. 716, 68 S. W. (2d) 25. The Federal Fidelity Company had a prima facie case established by its note with the name of Hoodenpyl signed thereto, but the moment Hoodenpyl denied that signature its prima facie case was destroyed, and a directed verdict against it was affirmed.

A good illustration is afforded by section 809, Ky.

Stats., which makes the killing or injury of stock by an engine or car of a railroad company prima facie evidence of negligence, yet, if the evidence of no negligence is otherwise uncontradicted, there is no issue to submit to the jury. Crawford v. Southern Ry., 150 Ky. 741, 150 S. W. 990; Kentucky Central R. Co. v. Talbot, 78 Ky. 621; McGhee v. Guyn, 98 Ky. 210, 32 S. W. 615, 17 Ky. Law Rep. 794.

With the presumption against suicide and the statements of this death certificate out of the way, let us look at the evidence.

We have abundant facts proven from which it can be inferred Tuggle committed suicide, and a conclusion rested on an inference is sound. See Kidd v. Modern Amusement Co., 252 Ky. 386, 67 S. W. (2d) 466. We have no facts from which we can infer this was an accident. Of course, one may guess this was an accident by supposing Tuggle had taken his gun into this basement to kill a rat and discharged it accidentally, but a supposition has no legitimate support or habitation in judicial administration. Louisville & N. R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257; Kidd v. Modern Amusement Co., 252 Ky. 386, 67 S. W. (2d) 466.

We are persuaded that this which is taken from a syllabus written by the court in the case of Agen v. Metropolitan Life Ins. Co., 105 Wis. 218, 80 N. W. 1020, 1021, 76 Am. St. Rep. 905, is correct:

"Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for a reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the trial court as one of law."

We will discuss briefly some of the authorities cited by the appellee. One is the case of Curtis v. Louisville City Railway Co., 14 Ky. Law Rep. 272, in which case the superior court said:

"A peremptory instruction is not authorized where the plaintiff has made out a prima facie case by his own evidence, no matter how strong and convincing

the court may deem the defendant's evidence to be.''

That case came to this court, and this court's opinion may be found in 94 Ky. 573, 23 S. W. 363, 15 Ky. Law Rep. 351, 21 L. R. A. 649, and with the opinion of the superior court before it this court did not adopt that language or approve it. Appellee cites the case of Mutual Life Insurance Co. v. Louisville Trust Co., 207 Ky. 654, 269 S. W. 1014. How that case can have any application to this one we are unable to see. He cites the case of Brunswick v. Standard Accident Insurance Co., 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213. But an examination of that opinion will disclose that neither the pleadings, upon either side, nor the instruction, nor the evidence, except the policy, contained the word ''suicide.'' The defense in that case was not rested upon a claim that the deceased had committed suicide. Hence that case is not applicable here. Appellee cites the case of American Benevolent Association v. Stough, 83 S. W. 126, 26 Ky. Law Rep. 1093. That was an action upon a life insurance policy, and of course the plaintiff's case was made out as soon as the policy was put in evidence, and it was shown that the insurer had been furnished with proof that the insured was dead. The insurer rested its defense upon the alleged suicide of the deceased and the burden was on it to prove that. In this case the beneficiary of this policy has alleged that Tuggles' death was accidental and in order to recover the beneficiary must sustain the burden of proving that. Appellee cites the case of Massachusetts Mutual Life Insurance Co. v. Bush, 236 Ky. 400, 33 S. W. (2d) 351, which he says cannot be distinguished from this one. But we think it can. Bush was found dead seated in his automobile. The motor was running, he had his pistol in his lap, and it was on a public road. There were other circumstances tending to indicate his death was accidental. Thus we need say nothing about whether or not we would adhere to that opinion if the facts were not distinguishable from the facts in this case.

So reserving all other questions, we have concluded the court erred in overruling appellant's motion for a directed verdict.

Judgment reversed.