## United Benefit Life Ins. Co. v. Schott.
## Mutual Benefit Health & Accident Ass'n. v. Same.

Nov. 3, 1943.

As Extended on Rehearing Feb. 29, 1944.

Robert Lee Blackwell and Bullitt & Middleton and Begley & Begley for appellants.

William Lewis & Son for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER
—Affirming.

The appeals are from judgments in favor of Elise Frye Schott, appellee, in her two separate actions which were tried together on the same testimony and before the same jury, upon (1) a Two Thousand Dollar ($2,000) life insurance policy issued by appellant, United Benefit Life Insurance Company (hereinafter called United Life), and (2) a Two Thousand Dollar ($2,000) accident and health policy issued by Mutual Benefit Health and Accident Association (hereinafter called Mutual Health). The insured was the son of Mrs. Schott, and met his death on July 21, 1940, from a gunshot wound. The policies were issued at the same time, upon a combination application. The United Life policy provided for payment of the benefit in a lump sum, upon the death of the insured. The Mutual Health policy provided for payment of the benefit in a lump sum upon the accidental death of the insured. Both policies provided that the Companies should not be liable in the event death should be caused by suicide. In the United Life Policy, the provision excluding suicide was contained in a clause separate from the clause providing for in-

demnity, whilst in the Mutual Health policy the words excluding suicide were contained in the clause providing for the indemnity. In the application for the policies, Schott represented (1) that his habits were correct and temperate, and (2) that his average monthly earnings were Seventy-Five Dollars ($75). Both Companies denied liability on the ground that Schott had committed suicide, and had made false answers in the representations aforesaid in his application. Upon their refusal to pay the indemnity provided for, Mrs. Schott filed the separate actions. The answers in both cases affirmatively pleaded that Schott had represented that his average monthly earnings were Seventy-Five Dollars ($75), whereas in truth they were not in excess of Fifty Dollars ($50) per month. The Court sustained a demurrer to this part of the answers. When the cases were called for trial, the parties jointly asked the Court to fix the burden of proof. The Court placed the burden on the defendant in each case; thereupon, both parties agreed, with the consent of the Court, to try the cases together, on the same evidence, and before the same jury. The jury rendered a verdict in favor of the plaintiff in each case.

Complaint is made, (1) that the Court erred in sustaining the demurrer referred to above; (2) that the Court erred in adjudging that the burden of proof on the whole case was upon the Mutual Health; (3) that the Court erred in ordering both Companies to furnish the plaintiff the names of all the witnesses they proposed to use at the trial; (4) that the Court erred in refusing to strike from the record, and instruct the jury not to consider, the testimony of witnesses based upon their own inspection of the seat cover of Schott's automobile, concerning the location of the bullett's entry, exit, and its range through the seat cover; and (5) that the Court erred in not directing the jury peremptorily to return a verdict in favor of each of the defendants.

The Mutual Health policy provided for indemnity, in the event of illness causing total disability and total loss of time, in the amount of Fifty Dollars ($50) per month. KRS 296.160 provides: "All statements or descriptions in any application for a policy of insurance shall be deemed and held representations and not warranties. Misrepresentations, in an application, unless they are material or fraudulent, shall not prevent a re-

covery on the policy.'' This section has been construed in many cases by this Court, in all of which we have held that the misrepresentation must be fraudulent or one material to the risk under which indemnity is sought; and, if the misrepresentation is in respect to a risk assumed by the company in the issuance of the policy, but upon which no claim has been asserted, the company will be held liable on the risk which was not materially affected by the misrepresentation. Eetna Life Ins. Co. v. Claypool, 128 Ky. 43, 107 S. W. 325; Claypool v. Continental Casualty Co., 129 Ky. 682, 112 S. W. 835; Ford v. Commonwealth Life Ins. Co., 252 Ky. 565, 67 S. W. (2d) 950; and Pacific Mutual Life Ins. Co. v. Arnold, 262 Ky. 267, 90 S. W. (2d) 44. In the Eetna case, supra [128 Ky. 43, 107 S. W. 327], the insured misrepresented his weekly earnings. The policy provided for weekly indemnity for total disability; it additionally provided indemnities in lump sums in the event of death, or the loss of certain members of the body, among which was the right hand, which constituted the loss sued on. In discussing the misrepresentation in respect to the weekly earnings of the claimant, the Court said: ''The representation of the insured in regard to his weekly earnings was immaterial to the risk upon which this action was based. The policy, as said before, is a combination accident insurance policy. * * * Now, it is manifest that the representations in regard to the weekly earnings of the insured have no reference to his right to recover for the accidental loss of life or limb, for which a round sum was payable, but are only material to the question of weekly indemnity. It was to the interest of the company to remove from the insured all temptation to prolong unnecessarily his absence from his vocation under the indemnity clause of the policy, and therefore, as a business proposition, it would seek to limit the weekly indemnity to a sum less than the insured would make if at his business. In the case at bar the insured was entitled, under the policy sued an, to the round sum of $2,500, but no weekly indemnity whatever. Therefore the indemnity clause of the policy has no material bearing upon the accident sued on.'' We are of the opinion that the reasoning contained in that, and other opinions above cited, is sound and should be continuously adhered to. We would not be understood to hold that in no state of case would the amount of the insured's earnings not be material

to the risk upon which the claim is based, because the company would be entitled to sufficient facts to determine whether the insured could fulfil the obligation imposed upon him by the contract, viz., the payment of the premiums. The premium for the combined policies amounted to approximately Six Dollars ($6) per month, and it is inconceivable that a person even making Fifty Dollars ($50) per month could not afford to carry these policies; or that the Companies would have rejected the application, had it contained a statement of the amount of monthly wage which the Companies alleged the insured was earning. The opinion in Provident Savings Life Assur. Society v. Whayne's Adm'r, 131 Ky. 84, 93 S. W. 1049, 1051, is not at variance with this reasoning, but, on the contrary, is consonant with it. The misrepresentations in that case were concerning different matters than the misrepresentation in this case, and the Court held that they were material to the risk imposed by the contract. Great reliance is made upon a single sentence in that case: "Nor is it material whether the misrepresentation caused the loss or not." But we see no connection that that statement can possibly have with the facts of this case. It certainly could not be maintained that a misrepresentation of the insured in respect to his monthly earnings caused the loss (death) for which appellee seeks to recover. We are, therefore, of the opinion the Court did not err in sustaining the demurrer to that part of the answer.

Undoubtedly, the Court erred in adjudging the burden of proof on the whole case to be upon the Mutual Health in the action against it. The rule is well established that in an action for accidental death, the burden of proof is upon the plaintiff to show that the death was caused by accident; and where an exclusion is contained in the clause providing for the indemnity, the burden is upon the plaintiff to negative the exclusion and introduce proof thereon, thus fixing the burden on the whole case. Provident Life & Accident Ins. Co. v. Spurlock, 242 Ky. 396, 46 S. W. (2d) 512; Prudential Ins. Co. of America v Tuggle's Adm'r, 254 Ky. 814, 72 S. W. (2d) 440; and North American Accident Ins. Co. v. White, 258 Ky. 513, 80 S. W. (2d) 577. But this error, apparent as it is, was not made to the prejudice of the Mutual Health; on the contrary, the error militated in its favor. By reason of the placing of the burden of proof on the Mutual Health, the latter

was accorded the privilege of introducing its evidence first, and of delivering the closing argument. The privilege of making the closing argument is universally recognized as a distinct advantage in the trial of any law suit, and this Court has repeatedly held that an error of the Court denying the burden of proof and the right to make the closing argument to the party entitled thereto, is an error so prejudicial to such party that it would require a reversal of the judgment, if judgment had been obtained against it. Mattingly v Shortell, 120 Ky. 52, 85 S. W. 215, 27 Ky. Law Rep. 426, 8 Ann. Cas. 1134; Royal Insurance Co. v. Schwing, 87 Ky. 410, 9 S. W. 242; Fireman's Insurance Co. v. Schwing, 11 S. W. 14, 10 Ky. Law Rep. 883; Crabtree v. Atchison, 93 Ky. 338, 20 S. W. 260; Lucas v. Hunt, 91 Ky. 279, 15 S. W. 781. The only possible result such a ruling could have, to the prejudice of the party awarded the burden of proof, would be the requirement of such party to persuade the jury to its contention in the case; but that burden is invariably controlled by the instructions, about which no complaint is made in this case, and which instructions, incidentally, place the burden of such persuasion upon the appellee. The error of the Court, therefore, was not prejudicial to the Mutual Health.

The third complaint is addressed to the propriety of the Court directing appellants to furnish to appellee the names of all the witnesses they proposed to use upon the trial of the case. It is admitted by appellants that they cannot show that they were prejudiced by the order; but we cannot refrain from criticizing the action of the Court, although we do not deem it to be sufficiently prejudicial to direct a reversal of the judgment. It is sufficient to say that the practice, if condoned, would be, in the words of the author of appellants' brief, "potentially vicious."

Appellants are not in position to complain because the Court refused, after the seat cover was introduced in evidence, to strike from the record and instruct the jury not to consider the testimony of witnesses based upon their inspection of the cover. Appellants themselves were the first to introduce the evidence they asked to be stricken. They could have required appllee, by subpoena duces tecum, to produce the cover; but instead, they chose to introduce witnesses and prove the location of the bullet holes by them. They cannot now

complain of this evidence, nor any evidence introduced in like manner.

There remains for our consideration but one question, and that is: Was the evidence of accidental death, excluding suicide, sufficient to submit that issue to the jury, or, was the evidence as a whole sufficient to establish that the insured, as a matter of law, met his death by suicide? A discussion of this question requires a brief resume of the evidence. On Saturday, July 20, 1940 (the night before the tragedy), at about 7:00 o'clock P. M., Schott and Delmer Fields started to Corbin in Schott's car. They drank two bottles of beer at a cafe in Corbin, or on the road to Corbin, and returned to London at about 11:00 o'clock, where they were joined by Miss Hazel Farris, pursuant to an arrangement Schott made with her in Corbin. Miss Farris and Schott took Fields to his home about midnight. Schott was in possession of a .38 caliber Colt automatic, and Fields a .45 caliber Colt automatic. Both pistols were in the glove compartment of the car. When Fields departed, he opened the compartment for the purpose of taking his gun out, but Schott askd him to leave it there until the next morning, when he would call for him to go to a baseball game. Schott took Miss Farris home, and departed therefrom at about 2:30 o'clock Sunday morning. On that morning Schott, in obedience to his promise, called for Fields at the latter's residence. Although there is much testimony in contradiction of Fields' statement, he testified that Schott looked like he had been drinking, looked tired and sleepy, and said to Fields that he had not been home all night. Schott and Fields went to East Bernstadt, where they were joined by two other friends. They drank one or two more beers, and procured two pints of whisky. Schott and Fields returned to East Bernstadt, where they were joined by Paul Muster, Elmer Reeser, and Willie Moore, and all attended a baseball game at Peoples, Kentucky. They returned to East Bernstadt about 4:00 o'clock P. M. Schott's and Fields' companions left the car, and Wandon McDowell, a nephew of Fields, joined them about 5:00 o'clock P. M. According to Fields and McDowell, Schott was intoxicated at this time and at all times thereafter. The three stopped at the residence of George Fox, where Fields obtained a drink of water. McDowell testified that after Fields left the car, Schott took the pistols, cocked them, and first held

them in front of him, then pointed them toward his chest, and continued brandishing and flourishing the pistols in that manner. McDowell finally obtained possession of the pistols, and hid them under his leg in the seat. Schott soon missed the pistols and commenced to search for them. He finally discovered one of them partially concealed under McDowell's leg, and demanded their possession, which he obtained. He commenced flourishing the pistols as before, first pointing them in front of and away from him, then crossing his hands he pointed them toward him, repeating these maneuvers many times. Fields stopped the car, and both boys tried to persuade Schott to quit flourishing the guns, but before they could stop him, the .38 pistol, which was held in his right hand, discharged, the bullet entering his chest two inches to the left of the median line, ranged downward, and to the right, and made its exit from his body approximately two inches to the right of his spinal cord and below the point of entrance. It then entered the back of the front seat, passing through the seat cover, and made its exit on the side of the front seat, thence into the right rear door. Immediately after the pistol discharged, Schott fell against Fields and said, "Delmer, I am through." About twenty minutes before the tragedy occurred, Schott tore his shirt off: McDowell begged him to preserve the shirt, but he threw it to McDowell with the statement, "I will not need the shirt, you can have it." Two or three weeks before his death, Schott was at the home of the grandmother of a girl whose company he was keeping. At that time he flourished a pistol and pointed it at his chest, and, either at that time or some other time, told the girl that he would kill himself, apparently in an endeavor to dissuade her from discontinuing their frequent visits together. We are not impressed with the seriousness of his intention on that occasion, and consider his actions to be mere swashbuckling, which is not unusual for a young man of that age. Nor do we think that the fact that he stated he did not need his shirt any more was a statement of a fixed determination to commit suicide. The brandishing and flourishing of the weapons, in the manner described by Fields and McDowell, do not impress us as having been more than the mere blustering and swaggering of a swashbuckler. Persons intent upon committing suicide are not apt to behave in that manner. All of the testimony shows Schott to have been

a cheerful person, who enjoyed life and companions; and there is no evidence of any conduct on his part indicating a serious thought on his part of taking his life. His reputation for industry, drinking, and general moral conduct was proven to be good; and while he would occasionally drink a beer, there is no evidence that he ever took a drink of whisky, except from the testimony of Fields and McDowell, and that only upon the day he met his death. Fields and McDowell were contradicted in many instances, both in respect of happenings on the day of the tragedy, and as to their previous statements as to how the accident occurred. But their testimony was introduced by appellants, and it is their testimony upon which appellants rely to reverse the finding of the jury. We have stated the facts in the light of their contention, and find them to be insufficient, if true, to show a clear case of suicide. We are of the opinion that, upon the testimony of Fields and McDowell alone, even though unimpeached, the facts presented were sufficient for the jury to conclude that Schott met his death accidentally, and without suicidal intent. That being true, we will not burden the opinion with detailing the evidence presented by appellee. The evidence, as a whole, convinces us that the verdict of the jury was correct.

The judgment is affirmed.