[No. 34243. Department One. February 13, 1958.]

ANN M. ANGELUS, *Respondent,* v. GOVERNMENT PERSONNEL LIFE INSURANCE COMPANY, *Appellant.*[1]

*Niemeier & Hamilton,* for appellant.

*Geo. W. Young* and *William J. Powell,* for respondent.

WEAVER, J.—Plaintiff, mother of the insured, is beneficiary under an insurance policy on her son's life, issued by defendant insurance company. She brings this action on the policy, alleging that the insured died October 31, 1955, as the result of a gunshot wound.

[1]Reported in 321 P. (2d) 545.

Defendant, by affirmative defense in the nature of confession and avoidance, admits the contract of insurance that, in part, provides:

"If the Insured shall commit suicide while sane or insane within two years from the date of issue hereof [April 1, 1954], the liability of the Company under this policy will be limited to the premiums that have been paid hereon and no more."

Defendant further alleges that the insured, "by his own act, took his life by shooting himself with a .45 calibre revolver," and thus committed suicide.

The insured died in Japan while on active duty with the armed forces of the United States. No testimony was taken at the trial. Counsel stipulated

". . . that the Marine Corps Investigation, and enclosures, . . . shall be all of the evidence in the above entitled action."

and

". . . that the Court is to disregard any opinions relative to whether or not the deceased died as a result of accident or suicide, which opinions were given by the investigating officer, Major Robert S. Hemstad."

■ The trial court did not have the advantage of seeing and listening to witnesses. It only considered the same written record that has been certified to us in its entirety. We may, therefore, determine the merits of the question raised without reference to the findings of fact entered by the trial court. *In re Black,* 47 Wn. (2d) 42, 45, 287 P. (2d) 96 (1955).

It should be noted that we are only concerned with recovery under the terms of a *life* insurance policy. We are *not* concerned with (a) death under the terms of an accident insurance policy, nor (b) with death under the provision of a life insurance policy that provides for a recovery of double-the-face value of the policy in the event of death by accidental means, as may be defined therein.

The sole question is: Did decedent commit suicide?

■ Plaintiff establishes a *prima facie* case with evidence that the insured died while the policy of life insurance was

in effect. Liability follows a showing of death, unless there is an affirmative showing that death was within an exception contained in the policy.

■■ In this case, suicide is an affirmative defense. The insurance company must establish, by a preponderance of the evidence (*Selover v. Aetna Life Ins. Co.,* 180 Wash. 236, 38 P. (2d) 1059 (1934)), that the wound that caused the death of the insured was intentionally self-inflicted. *New York Life Ins. Co. v. Newport,* 1 Wn. (2d) 511, 517, 519, 96 P. (2d) 449 (1939). Although not necessarily controlling, the presence or absence of motive for suicide is an element to be taken into consideration.

There is very little, if any, dispute as to the facts surrounding the death of the insured. The disagreement is over the conclusion to be drawn from these facts.

The following appears from the written statements gathered by the investigating officer:

Decedent, twenty years old at the time of his death on October 31, 1955, was attached to a Marine fighter squadron as an aircraft radar technician. He was assigned to a guard company for temporary duty, which was to terminate the day of his death.

His guard duties required that he be familiar with a .45 caliber automatic pistol. On numerous occasions, while acting as corporal of the guard, he had given instruction on the use of the automatic pistol and on safety precautions to be observed while handling it.

Throughout decedent's tour of duty with the guard, all pistols assigned to personnel on post or on duty were kept with a loaded clip inserted, but no round of ammunition was in the chamber. It was common knowledge among members of the guard that all pistols in actual physical custody of guard personnel were loaded.

Decedent is described as a happy-go-lucky individual with no known disturbing problems. He was a good worker, cheerful, and competent in his temporary additional duty assignment. One of his associates states:

"He was an exceptionally good natured marine and I never knew him to worry or sweat anything. I had known

him a good while and was a very close friend of his. It always appeared to me life was just a big joke to him and I told him several times he ought to take things more seriously."

About eleven a.m. the day of his death, decedent talked with Corporal Last, who reported that he "seemed to be in a very good mood. He was especially happy because he was off guard and had liberty that night."

About five p.m. of the same day, Sergeant Nelson asked decedent "when he was coming back to work with me in fire control. He told me that he would be down in the morning and ready to go to work."

About five-thirty p.m., decedent and Corporal Tishler, with whom he was going on liberty, entered hut No. 5. Decedent talked with Corporal Ball, who stated:

". . . He was laughing and seemed to be in very good spirits as he was going on liberty and he was kidding me because I had the duty. He walked into the head [lavatory] to comb his hair and I heard him laugh and then the report of the .45."

While Corporal Tishler was combing his hair, decedent grabbed a pistol belt hanging on a peg, pulled the pistol out of the holster, "jacked a round into the chamber," put the pistol to his head, and said, "Here's to it," and fired the pistol. He died several hours later.

On previous occasions, decedent had been observed playing a modified version of "Russian Roulette" with a .45 caliber automatic pistol, the same type which caused his death. He would squeeze the release on the clip, allow it to slide down, then pull the slide to the rear, and release it. If the clip dropped about half an inch, the slide would not pick up a round from the clip and place it in the chamber. The clip was then locked in place, the pistol placed at his temple, and the trigger pulled. In truth, this is not "Russian Roulette," which is played with a revolver and not an automatic pistol. His safety depended upon sleight-of-hand and not chance.

"He would never do it unless he was just trying to 'shake someone up.' He always laughed afterwards."

One witness stated that *the clip was not in the weapon* when it was recovered from the floor after the shooting. Another witness stated, when describing the weapon after the shooting,

"The pistol was fully cocked with one (1) round in the chamber and three (3) rounds in the magazine *when recovered.*"

This suggests the hypothesis that decedent believed he had released the clip and caused it to drop, so that the slide had not "jacked a round into the chamber" of the pistol. If this be true, he was mistaken.

In *United Benefit Life Ins. Co. v. Schott,* 296 Ky. 789, 796, 177 S. W. (2d) 581, 150 A. L. R. 1359 (1943), a case factually akin to the instant one, the court said:

"The brandishing and flourishing of the weapons, in the manner described by Fields and McDowell, do not impress us as having been more than the mere blustering and swaggering of a swashbuckler. Persons intent upon committing suicide are not apt to behave in that manner."

We agree with the trial court; appellant did not establish suicide by a preponderance of the evidence.

The judgment is affirmed.

HILL, C. J., MALLERY, FINLEY, and OTT, JJ., concur.

---

March 27, 1958. Petition for rehearing denied.