**Mildred C. TRIVETTE, Plaintiff-Appellant,**

v.

**NEW YORK LIFE INSURANCE COMPANY, Defendant-Appellee.**

**No. 13910.**

United States Court of Appeals
Sixth Circuit.

Oct. 31, 1960.

---

442

See also 270 F.2d 198.

O. T. Hinton, Pikeville, Ky., for appellant, Herman G. Dotson, and Hinton & May, Pikeville, Ky., on the brief.

R. Lee Blackwell, Louisville, Ky., for appellee, Thomas W. Bullitt and Bullitt, Dawson & Tarrant, Louisville, Ky., on the brief.

Before MILLER and POPE, Circuit Judges, and KENT, District Judge.

KENT, District Judge.

This action is based upon four policies of insurance issued by the defendant company prior to the death of the insured, Maurice Trivette, of which the plaintiff widow was the beneficiary. Under the terms of the policies "double indemnity" was to be paid in the event of accidental death. The principal amount of the four policies was $30,000, which was paid by the defendant company. The District Court directed a verdict against the plaintiff (appellant) at the conclusions of the plaintiff's proofs. The issue is whether the plaintiff is entitled to double indemnity for the death of the insured.

During the argument in this Court plaintiff's counsel conceded that the decedent shot himself. It was the theory and claim of the plaintiff that the decedent "might not" have intended to shoot the gun, that he "might not" have intended to kill himself, that he only intended to "scare" the members of his family. Admittedly, he put the gun to his forehead in the presence of the plaintiff and the gun was fired resulting in the death of the decedent. Plaintiff relies upon Dick v. New York Life Ins. Co., 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 (and other cases which need not be discussed), a case decided under the law of North Dakota in which the Supreme Court of the United States held that the burden was upon the insurer to establish that the death of the insured was due to suicide. Under Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, this Court and the District Court are required to follow the law of the State of Kentucky. The trial court had before it the decision of the Court of Appeals of the State of Kentucky in Prudential Ins. Co. v. Tuggle's Adm'r, 254 Ky. 814, 72 S.W.2d 440. After that decision and prior to the argument of the principal case before this Court, the Court of Appeals of Kentucky decided Prudential Ins. Co. v. Hattie Bell Redwine, Adm'x of Ewen, 1959, 332 S.W.2d 643. In many respects the facts in Prudential Ins. Co. v. Redwine, supra, were

similar to the facts in the present case and as pointed out by the Court at 332 S.W.2d 643, at page 646—"It must be remembered that the plaintiff had the burden on the whole case of proving death by accident. Massachusetts Mut. Life Ins. Co. v. Bush, 236 Ky. 400, 33 S.W.2d 351."

█ In Prudential Ins. Co. v. Redwine, supra, the Court of Appeals of Kentucky approved its earlier decision in Prudential Ins. Co. v. Tuggle's Adm'r, supra. The facts in the instant case are such as to require the same result as that reached by the Court of Appeals of Kentucky in Prudential Ins. Co. v. Redwine, supra. The District Judge could not submit the principal case to the jury for speculation or surmise as to some cause other than suicide for the death of the decedent. At the conclusion of the argument on the motion for a directed verdict Judge Swinford stated in part—

> "In my opinion, gentlemen, there is no point in prolonging something unless there is a basis of law on which it might rest. In my opinion, in this case it was conclusively shown that it was not the result of an accident but it was the result of a deliberate act on the part of the deceased, under circumstances under which, by no stretch of the imagination, could the jury conclude that there was an accident. That will be the judgment of the court."

For the reasons set forth by Judge Swinford as the basis for directing a verdict for the defendant, and on authority of Prudential Ins. Co. v. Tuggle's Adm'r, supra, and Prudential Ins. Co. v. Redwine, supra, the decision of the District Court must be affirmed.

POPE, Circuit Judge (dissenting),

Since I find myself unable to concur in the majority opinion, I think I should state the reasons for my disagreement. They are several.

The opinion assumes that the rule of Erie Railroad Co. v. Tompkins is to be applied here. As I shall indicate later, I think a more complete statement of the facts would call for a different result even assuming the propriety of the Erie Railroad Co. approach. But if, as I am convinced, this case is not ruled by Erie, then the reasons for a different result are even stronger.

I realize that in Lovas v. General Motors Corp., 6 Cir., 212 F.2d 805, 807, this court said that in a diversity case whether a plaintiff's evidence is sufficient to take the case to the jury is a question to be decided according to state law. But an examination of that case shows that it was decided, as the court said, upon principles that "are well settled under both state and federal law." It cannot be said that any different result would have been reached no matter which law, state or federal, was applied. In short, it cannot be said that the expressed view as to the applicability of the Erie Railroad case was necessary to the decision.[1] Our case, however, is one which might well turn on the question whether I am right in my view that, as put by Professor Moore,[2] "The sufficiency of certain evidence to raise a question of fact for the jury * * * should not be controlled by state law."[3]

As time goes on it becomes increasingly clear that, as often stated by the Fifth Circuit, "[t]he kind of jury trial to which the parties are entitled in Federal Courts under Rules 38 and 39 of the Federal Rules of Civil Procedure, 28 U.S.C.A., is that preserved by the Seventh Amendment to the Constitution, to which the doctrine of Erie Railroad Co. v. Tompkins, * * * is of course subservi-

---

1. The Lovas case was one in which the physical facts were such that there was "no substantial evidence of probative value to support the appellant's charge."

2. Moore's Federal Practice, 2nd Ed., § 38.█

3. I am not suggesting a reexamination by this court, as now constituted. In some circuits with which I am familiar, reexamination under such circumstances is accomplished after reargument before the court sitting en banc.

ent." Pogue v. Great Atlantic & Pacific Tea Company, 5 Cir., 242 F.2d 575, 582.[4]

This is exactly the same principle applied by the Supreme Court in Byrd v. Blue Ridge Cooperative, 356 U.S. 525, 537, 78 S.Ct. 893, 901, 2 L.Ed.2d 953, where the Court said: "An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence— if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. * * * The policy of uniform enforcement of state-created rights and obligations, * * * cannot in every case exact compliance with a state rule—not bound up with rights and obligations— which disrupts the federal system of allocating functions between judge and jury."

I am not suggesting that the Byrd case dealt with the precise question presented in the case now before us. It is plain that the Supreme Court has not thus far directly expressed itself upon the question which I here discuss.[5] But the clarity with which the Court there declares the principle which underlies the decision of the Fifth Circuit in the Pogue case, to my mind furnishes clear evidence that when it does find occasion to speak, the Supreme Court will agree with what was said in the Pogue case.

In my opinion there are compelling reasons for regarding the position of the Fifth Circuit as the only tenable one. Such is also the view of the Courts of Appeals for the Fourth, Ninth and Tenth Circuits. Davis Frozen Foods v. Norfolk Southern Ry. Co., 4 Cir., 1953, 204 F.2d 839, 842; State of Washington v. United States, 9 Cir., 1954, 214 F.2d 33, 40; Smith v. Buck, 9 Cir., 1957, 245 F.2d 348, 349; Allen v. Matson Navigation Company, 9 Cir., 1958, 255 F.2d 273, 281– 282.[6] Diederich v. American News Co., 10 Cir., 1942, 128 F.2d 144; Basham v. City Bus Co., 10 Cir., 1955, 219 F.2d 547, 52 A.L.R.2d 582; Miller v. Irby, 10 Cir., 1955, 227 F.2d 942.

As noted in Dick v. New York Life Ins. Co., 359 U.S. 437, 445, 79 S.Ct. 921, not all of the courts of appeals have agreed upon this proposition. An examination of those cases which have purportedly followed state decisions as to what constitutes a sufficient case for the jury convinces me that in the main they are distinguishable either on the ground that the court found it unnecessary in the particular case to pass upon this point, or because the case really involved a problem of state substantive law such as the existence of presumptions and the location of burden of proof.[7]

---

4. Other cases to the same effect in the Fifth Circuit are: Reuter v. Eastern Air Lines, 226 F.2d 443, 445; Revlon v. Buchanan, 271 F.2d 795, 800.

5. Stoner v. New York Life Ins. Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284, sometimes misunderstood, is discussed by Moore, § 38.10 supra, who suggests it should be regarded as "a novel application of the doctrine of 'the law of the case.'" I agree with Judge Magruder that it "had to do with the application of the doctrine of res judicata, which certainly is a matter of substantive law." Schell v. Ford Motor Co., 1 Cir., 270 F. 2d 384, 388 (dissenting opinion, cited infra, note 8). The most conclusive indication that the Supreme Court considers it has not decided this question is the fact that in Dick v. New York Life Ins. Co., 359 U.S. 437, 445, 79 S.Ct. 921, 3 L.Ed.2d 935, the Court noted the de-

cisions of the Courts of Appeals without any reference to any decision of its own.

6. In this last case the court cited with approval the rule stated by Moore, supra, and the Pogue case, supra, and noted that the state court's decisions indicated that the state court would reach the same conclusion. See footnote 11, 255 F.2d at page 282. Also in that case, although jurisdiction was predicated upon diversity of citizenship, the action was to recover for a maritime tort. See footnote 5 and accompanying text commented upon in Romero v. International Terminal Operating Co., 358 U.S. 354, 376, 79 S.Ct. 468, 3 L.Ed.2d 368 (footnote 44).

7. That these latter are to be regarded as questions of substantive law was stated in Dick v. New York Life Insurance Co., supra, 359 U.S. at page 446,

For instance, the latest discussion of a similar question in the Second Circuit is to be found in Presser Royalty Company v. Chase Manhattan Bank, 1959, 272 F.2d 838, 840. There the court said: "In this diversity action brought in the Southern District of New York and involving only issues of state law the question whether the evidence was sufficient to take the case to the jury is *probably* to be determined by New York law." (Emphasis mine.) The use of the word "probably" clearly indicates that the court found it unnecessary for the purposes of the case to decide the question, and also that it had some reservations upon the question.

This is further indicated by the fact that the court called attention to a dissenting opinion of Judge Magruder expressing an opposite view. (In Pierce Consulting Eng. Co. v. City of Burlington, Vt., 2 Cir., 1955, 221 F.2d 607, which the court cited, the court showed similar doubts as to whether state law controlled, citing Moore and cases from the Fourth and Tenth Circuits.) Interestingly, although the court cited a number of other cases from the Second Circuit, it failed to cite its own decision in Reynolds v. Pegler, 223 F.2d 429, 433–434, where it said that the "better view" would seem to be that expressed by Moore and by decisions in the Ninth and Tenth Circuits. I am of the opinion that the question is still an open one in the Second Circuit.[8]

I am therefore confident that Professor Moore is basing his conclusion upon what is the great weight of authority in the federal courts when he stated in the section previously referred to that the sufficiency of certain evidence to raise a question of fact for the jury should not be controlled by state law but is rather a question of federal law under the federal system which, in the language of the Byrd case, supra, "distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury." [356 U.S. 525, 78 S.Ct. 901]

If I am right in that, then, when the full facts in this case are considered it seems clear to me that the judgment should be reversed.

As I read the majority opinion, the facts of this not too simple case are recited in a single sentence where it is said decedent "put the gun to his forehead in the presence of the plaintiff and the gun was fired resulting in the death of the decedent." This statement is not only inaccurate but very incomplete.

At the time of his death Trivette was 45 years of age. He had two children by a former marriage, and appellant and he were married in 1945. They had four

**8.** The question has not I think been presented for decision in the First Circuit although twice Judge Magruder, dissenting, has posed the question here discussed; on one occasion reserving judgment on the point, and on another suggesting that the point he sought to make would have been a better ground for the court's conclusion. These cases are Metropolitan Coal Co. v. Johnson, 1 Cir., 265 F.2d 173, dissent at page 182; and Schell v. Ford Motor Co., 270 F.2d 384, dissent at page 387. In the Third Circuit, that court purported to follow the local state rule as to what was required to make a case for the jury. Lennig v. New York Life Ins. Co., 1941, 122 F.2d 871; Waldron v. Aetna Casualty Co., 1944, 141 F.2d 230. It seems plain they are based upon a misunderstanding of the Stoner case, cited supra, note 5. In Clay County Cotton Co. v. Home Life Insurance Co., 113 F.2d 856, the Eighth Circuit appears to recognize the rule stated by Moore that in respect to the procedural questions a federal court in a diversity case will follow the federal law. However, in the final paragraph of the court's opinion it held that a motion for a directed verdict raised a question of substantive law, namely, whether aggravation of a pre-existing disease through accident constituted accidental injury; accordingly it followed the state law. In Curry v. Pyramid Life Ins. Co., 8 Cir., 271 F.2d 1, 3, the court quoted with approval from the Byrd case, supra, the statement of that Court that "It cannot be gainsaid that there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts."

children born of their marriage, the eldest of whom was 10 and the youngest, 5. These four children and the youngest of the children by the former marriage lived with him and the appellant. He was engaged in the coal mining business and as an adjunct to it operated a garage. The business was prosperous; he drew a salary as executive vice-president and general manager of $700 per month. His wife and oldest son each drew a salary or dividend also. He had no business problems; he was attentive to and affectionate with his wife and children and within a week preceding his death he had made plans to install a children's playground for his own and the community children on an adjacent lot. He had no health problems. In short, the evidence negatives any possible motive or reason for suicide.

The evidence does disclose that Trivette was given to occasional fits of anger in which his actions were so fantastic and bizarre as to indicate a serious mental instability. During these explosive tantrums Trivette would engage in violent actions usually accompanied by shooting of the pistol. Some 10 years previous to his death when the family lived in Indiana, Trivette became "quite angry" when he had had trouble with some hired hands and "he got the gun out," "stomped out the house," fired his pistol and was found outside sitting on the sidewalk. Some seven years later he became angry because of an interruption of his Saturday night dinner plans and "broke up all the things in the living room"; "just started swiping everything off the tables and wrecking them off, and there was glass all over the living room and dining room." He got his gun out and "slung it around just like he was swinging his hands around before and ordered his wife to clean up the mess." Approximately two years prior to his death in another similar tantrum he got his pistol and shot out the light in the center of the ceiling of his bedroom, the same room in which he was finally shot. The testimony indicated that after such demonstrations of anger he would quickly recover and often when they occurred he had been drinking whiskey.

On the occasion when he was shot he went into a similar tantrum. He had eaten dinner with his family and the steaks served had been selected by his brother-in-law with whom Trivette was out of sorts on account of the former's failure to repay a loan owing to Trivette; the steaks proved to be tough and Trivette refused to finish his dinner and became sullen. He continued sullen and incommunicative and then went to the garage to get some money and after about twenty minutes he returned to the house still in an ugly mood. He went into his bedroom and motioned to his wife to come in. His wife had bought him a shirt and a pair of slacks and he was about to pack a bag in order to spend a night at a motel to avoid night calls from the garage. At the sight of the shirt and slacks he became violent; he found the sleeves of the shirt about a quarter of an inch too long and tore it and the slacks saying: "Don't buy me any more clothes." He threw the torn slacks and shirt across the bed toward his wife; he was then standing in a narrow space between the bed and the wall with his right side next to the wall. At this point his wife started to get up to calm him when suddenly he pulled a gun from under his coat and belt with his right hand and with a single sudden motion "like a flash" fired the pistol upward. The pistol was a 44 Special Smith & Wesson revolver which measured 12½ inches from muzzle to butt with a weight without ammunition of 38 ounces. It was loaded with 5 cartridges each 1½ inch in length.

It is a permissible inference from the record that when Trivette "like a flash" and in a fit of blind anger suddenly jerked this extraordinarily heavy gun from his belt, he intended to do precisely what he had done before, shoot into the ceiling, and that in attempting to do so all in one movement, his elbow struck the wall by which he was standing and the shot was deflected to hit the side of his

head and range upwards to the top of his head.[9]

Mrs. Trivette testified that he was standing close to the wall; as he pulled out his gun and raised it, he pulled his arm back; and although she did not actually see his arm strike the wall, "I thought that he had because he was standing so close to the wall; I stood in the same position he did and I could not see how he could get the gun to his head without striking the wall."

I think that a jury would properly infer that the manifest purpose of Trivette was not to harm himself but to frighten his wife just as he had done on the prior similar occasions. The inferences are all against any purpose of self destruction and an inference of accidental shooting is plainly suggested.

But if I am right in my view that this court ought to follow the federal rule as to what makes a case for a jury, then beyond the peradventure of a doubt were this case in the hands of the Supreme Court it would as summarily reverse this judgment as it did in Williams v. Carolina Life Insurance Co., 348 U.S. 802, 75 S.Ct. 30, 99 L.Ed. 633, reversing 5 Cir., 210 F.2d 477; Swafford v. Atlantic Coast Line RR Co., 350 U.S. 807, 76 S.Ct. 80, 100 L.Ed. 725, reversing 5 Cir., 220 F.2d 901; Union Trust Co. v. Eastern Air Lines Inc., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796, reversing 95 U.S.App.D.C.

189, 221 F.2d 62; and Gibson v. Phillips Petroleum Corp., 352 U.S. 874, 77 S.Ct. 16, 1 L.Ed.2d 77, reversing 5 Cir., 232 F.2d 13. None of these are F. E. L. A. actions. All but one are diversity cases.

I am willing to go further: I feel certain that even the Kentucky court if presented with the facts which I have here set forth would say that this was a case properly to be submitted to the jury. I can find no resemblance between the facts here proven and those in the Kentucky cases the court here relies upon. That a jury may properly draw its own inferences from other facts proven was recognized in United Benefit Ins. Co. v. Schott, 296 Ky. 789, 177 S.W.2d 581, 150 A.L.R. 1359; Kentucky Home Mutual Life Ins. Co. v. Watts, 298 Ky. 471, 183 S.W.2d 499.

I have another and different objection to the result here reached. It relates to two of the four policies sued upon, and is based upon a long line of Kentucky decisions holding that in an action on a life policy which provides that self-destruction while sane or insane, is a risk not assumed by the insurer, recovery may be had if the insured was so insane that he could not understand the nature of his acts.[10]

At the oral argument counsel for appellee was queried about these cases, and asked why they did not require the submission to the jury of the question of

---

9. The majority opinion states that he "put the gun to his forehead". This is inaccurate in two respects. The bullet entered just above and forward of the right ear. About the hole were powder marks ¾ of an inch in diameter from which it could be inferred that the muzzle was not against his head. The bullet came out "just to the left of the center line of the top of the head" and entered the ceiling of the room, ranging upward at about a 50 degree angle.

10. Equitable Life Assur. Soc. Etc. v. Bailey, 214 Ky. 754, 284 S.W. 403, at page 404: "Under a long line of decisions * * * it is held that in such circumstances [where a party is so insane that he does not understand the nature or the character of the act] there may be a recovery upon a life policy notwithstanding the provision in the contract attempting to protect the insurer from death by self-destruction." Sovereign Camp of Woodmen of the World v. Havas, 217 Ky. 846, 290 S.W. 690.

I make no effort to list numerous earlier cases to the same effect. Appellee's brief describes these as "the large group of 'suicide' defense cases where under the Kentucky law the company has the burden of proving that at the time of suicide he had sufficient mental capacity to appreciate the consequences of his act; and there was substantial evidence that at such time he was such a lunatic or so 'devoid of reason' that he *lacked* that mental capacity—and of course that substantial evidence created a jury issue on the *mental* capacity issue."

Trivette's mental condition. In a supplemental brief, filed after the argument, appellee replied to this by stating that since this is a suit to recover double indemnity insurance, it is ruled by Equitable Life Assur. Soc. v. Bailey, 203 Ky. 339, 262 S.W. 280, 39 A.L.R. 160, "because nearly all Double Indemnity provisions * * * expressly *exclude* from Double Indemnity death resulting from infirmity of mind or body, or of illness or disease; and if the insured's self-destruction occurs when he has such infirmity his death is *automatically* excluded." [11]

This would appear to be a good answer so far as two of the policies are concerned. For those two policies contained substantially the same language as that found in the policy described in the case cited by counsel (which might be termed the first Bailey case). They provide that the double indemnity shall not be payable if the insured's death "resulted from any one or more of the following:—self-destruction, whether sane or insane; * * infirmity of mind or body. * · * * "

But the other two policies are quite different. They contained the usual suicide clause, "sane or insane," the same clause found in most of the policies in the large group of Kentucky cases previously mentioned, including the second Bailey case, 214 Ky. 754, 284 S.W. 403, and the Sovereign Camp Woodmen case cited above. They contained no clause excluding coverage in case of death resulting from infirmity of mind.[12] In contrast to the other policies these exclude "death caused or contributed to by bodily infirmity." I need not cite cases to support the universal rule that such policies must be construed most strongly against the insurer. And by no possibility can it be said that a reference such as this to "bodily infirmity" means the same thing as if it said "infirmity of mind or body." [13]

Because the court directed a verdict at the close of plaintiff's case, we are not concerned here with the question of where lay the burden of proof, or in what form instructions should be cast. But it is plain to me that the rule of the first Bailey case has no place here. The issue of mental capacity should have been submitted to the jury under the rule of the second Bailey case and the many others in accord.

The conduct of Trivette at the time here in question was not only not normal and irrational, it was so strange, erratic and wild as to show the characteristics of a temporarily deranged and unhinged lunatic. The jury, to whom the issue of mental derangement should have been submitted in respect to the claim on these

11. In this case cited by counsel the double indemnity clause provided: "This agreement to pay an increased amount in the event of death from bodily injury does not cover self-destruction, sane or insane * * * or death resulting, directly or indirectly from bodily or mental infirmity." Said the court: "In other words, she could not, in order to entitle herself to the $10,000 ordinary life insurance, allege and prove that the insured was so insane as not to appreciate the nature and consequence of his act, and at the same time deny that his death resulted directly or indirectly from bodily or mental infirmity, in order to entitle her to the double indemnity insurance against accidental death."

12. The clauses in these two policies read as follows: "The Company will pay to the beneficiary, subject to the terms and conditions of this policy, an additional amount (the double indemnity benefit) equal to the face amount of this policy upon receipt of due proof that the insured's death resulted directly, and independently of all other causes, from accidental bodily injury and that such death occurred within 90 days after such injury and before the earliest of the following: * * * (However, the double indemnity benefit will not be payable if such death results from (a) suicide, whether sane or insane, * * * nor will such benefit be payable if such death is caused or contributed to by bodily infirmity, or any illness or disease other than a bacterial infection occurring in consequence of an accidental injury on the exterior of the body."

13. This is particularly true here where the same company issued the policies and issued them at a later date than the others.

two policies, could well find mental unsoundness sufficient to bring the case within the Kentucky rule here mentioned.[14]

---

14. It is not contended that this evidence must be supplemented by opinion evidence. Mental condition or capacity may be proven by circumstantial evidence such as the person's outward conduct. Wigmore on Evidence, 3d Ed., §§ 227–228; Cooley's Briefs on Insurance, 2nd Ed., page 5472. Inter-southern Life Ins. Co. v. Boyd, Ky., 124 S.W. 333, 334: "All that we can do is to inquire into his surroundings, his condition, his personal relations, his domestic affairs, his habits, his traits of character, and from these make up our minds the best we can whether the suicidal act was intentional or the result of a state of mind that deprived the person of the power of understanding the nature and quality of his act."