Elsie B. **ALLEN**, George D. Allen,
Appellants,

v.

**MATSON NAVIGATION COMPANY,**
a corporation, Appellee.

No. 15463.

United States Court of Appeals
Ninth Circuit.

April 7, 1958.

Rehearing Denied June 5, 1958.

M. Mitchell Bourquin, Guernsey Carson, San Francisco, Cal., McCune, Hiaasen, Kelley & Crum, Carl A. Hiaasen, Fort Lauderdale, Fla., for appellant.

Brobeck, Phleger & Harrison, Samuel L. Holmes, San Francisco, Cal., for appellee.

Before STEPHENS, Chief Judge, and POPE and CHAMBERS, Circuit Judges.

POPE, Circuit Judge.

The appellants, who are husband and wife, and residents and citizens of Florida, brought this action against appellee Matson Navigation Company, a California corporation, to recover damages resulting from a fall which Mrs. Allen suffered while a passenger upon the Matson Steamship Lurline.

Mrs. Allen sought damages for personal injuries received by her in the fall, and Mr. Allen sought recovery for sums expended for the care and treatment, and for the loss of the society, services and consortium of his wife. Upon trial before a jury a verdict was returned in favor of each plaintiff and judgments entered thereon. The defendant had moved for directed verdicts in its favor, upon which the court reserved ruling, and after verdict and judgment against it, it moved for judgment notwithstanding the verdict. The motion was granted, and judgment notwithstanding the verdict was entered. It is from that judgment that this appeal is taken.

Plaintiffs went to trial upon a complaint which alleged that on October 1, 1953, while the ship was being docked and berthed in San Francisco, and before the discharge of her passengers, and when plaintiffs were passing over a landing upon a stairway, Mrs. Allen slipped and fell and suffered the injuries complained of. These, it was alleged, were the direct and proximate result of defendant's negligent maintenance of the stairway and landing in a dangerous and excessively slippery condition.

The time and place of Mrs. Allen's fall was not a subject of controversy. Early on the morning of the day mentioned, the passengers were notified that they would land at San Francisco immediately following breakfast. When the Allens arrived at E deck for breakfast they were told that they would be obliged to go to the upper A deck to obtain their landing permits before they were served breakfast. Accordingly they went to A deck, waited in line for their permits, and then started to descend to E deck. Finding a large crowd waiting for the elevators they decided to walk down the stairway. Mr. Allen walking next to the railing and Mrs. Allen next to him. Both testified that either he was holding Mrs. Allen's arm or she was holding his as they descended the stairs. Midway between each deck as they walked down the stairs they came to a landing. While they were walking across one of these landings Mrs. Allen fell backward, her feet slipping out in front of her so she was thrown flat upon her back.

In support of her claim that the landing was unsafe because of an excessively slippery condition, the appellants relied upon the following evidence: the witness Johnson, a fellow townsman of the Allens, who with his wife had made the trip to Hawaii with them, described the location of the landing where Mrs. Allen fell and said that it was "slippery". He said:

"Q. (By Mr. Bourquin): Had you experienced any difficulty with your footing in crossing that landing on that morning or on earlier oc-

casions when you crossed it? A. Well, I had had the sense of extreme caution in going down those steps not only that morning but other times.

"Q. What do you mean by that? A. Well, if you approach a slippery surface, naturally you have that sense of feeling of caution.

"Q. (By the Court): Well, was the surface slippery? A. I would say it was slippery. * * *

"Q. We want you to tell us, if you can, Mr. Johnson, was it just a little slippery or was it very slippery? What was it? A. I would say it was quite slippery."

Mrs. Allen testified that when she fell she had stepped from the stairs to this landing and was about half-way across it when her feet went out from under her and she fell flat upon her back. Both of her feet went up, and "I fell on my back". Describing the condition of the landing, she said:

"Q. Did you see or observe anything with respect to the condition of the stairs or the landing that morning now that you can tell us of before you fell? A. Just that I

perceived that it was more or less shiny and slippery, and I realized I would have to use a little caution on it.

"Q. What do you mean when you say it was slippery? How was that apparent to you? A. Just to look at it—observation.

"Q. Had you noticed any such condition on the stair or landing on other occasions than that morning? A. Yes."

At one point in her testimony the court intervened saying: "Why don't you ask the witness, if I may suggest it to you, counsel, how it was, by what senses she determined the flooring was slippery,— by her eyesight, by her feeling or by whatever it is, what sense she used in perceiving the condition of the flooring, if that is what you are trying to get at?" Asked to answer that question suggested by the court, Mrs. Allen replied, "Not only looking at it, the high polish and slipperiness of it, but my feet when I stepped on it, I realized I would have to be careful,—the way my feet hit that flooring, I realized I would have to be careful." She went on to state that when she stepped on that flooring, "I would more or less slip." [1]

---

1. This testimony was given in the course of colloquy between court and counsel in which some portions of the answers given by the witness were stricken. This portion of the record reads as follows:

"The Court: It also calls for an opinion and conclusion. Why don't you ask the witness, if I may suggest it to you, counsel, how it was, by what senses she determined the flooring was slippery,— by her eyesight, by her feeling or by whatever it is, what sense she used in perceiving the condition of the flooring, if that is what you are trying to get at?

"Mr. Bourquin: It is.

"Q. Can you answer the question that the Court suggested? A. I will answer it.

"Q. Please. A. Not only looking at it, the high polish and slipperiness of it, but my feet when I stepped on it, I realized I would have to be careful,—the way my feet hit that flooring, I realized I would have to be careful.

"Q. But you don't tell us what way you came to that realization; that is

what we want to know. A. When I stepped on the flooring I could tell that I would have to be careful, I would more or less slip.

"Q. In other words, the footing underneath—Mr. Holmes: May that go out, your Honor, as a conclusion? It is still the opinion of the witness; she hasn't stated any facts.

"Mr. Bourquin: She said she more or less slipped.

"The Court: The last part of the answer is responsive; the first part is not. That she realized that she would have to be cautious is her conclusion. That may go out. The last part of the answer that she more or less slipped may stay in, because that is a statement of fact.

"The Witness: That is true.

"Mr. Bourquin: On earlier occasions in traversing the stairway and landing in question had your feet more or less slipped? A. Correct, yes.

"Q. Until you took greater precautions? A. Yes.

Mr. Allen's description of the surface of the landing was as follows: "Well, it was always very highly polished and very smooth, and the morning I came down I noticed when I hit the last step coming down that I looked down to see whether I had any more steps to go, and I saw this was just as shiny, high glossed as anything could be and I slowed up my steps, cut my steps a little shorter when I started on the flat surface."

In describing his wife's fall, Mr. Allen said that both her feet flew out in front of her at the same time; she fell prone on her back, mostly on her hip. This was on the landing on the staircase between C and D decks. On cross-examination he testified that the landing was "awfully slippery"; and that the gloss on it was "high and shiny".[2]

A Mrs. Dykstra, a passenger on the ship who saw Mrs. Allen fall, said that Mrs. Allen's feet slipped out from under her and she fell with a thud, flat on her back, both feet flew forward together. She described the appearance of the surface of the landing as "extremely shiny."

The evidence further showed that the flooring of the landing where Mrs. Allen fell, as well as the stairs and the passage ways about the ship were covered with a rubber tile commonly used for such purposes; the floors of the lounge and the foyer of the ship were regularly mopped and waxed and buffed with a machine provided for that purpose; and the stairs and landings were swept and mopped. In its answer to interrogatories the defendant stated that "the stairway[3] has been frequently mopped with water containing a small amount of Franklin's Rubber Gloss Cleaner and Ajax Cleanser has been used occasionally during such mopping. The water and cleaning substances have been applied * * * by means of a string mop. * * * The water and cleaning substances were then removed by the mop after the water had been wrung out of it."

The defendant called as an expert witness its marine engineer and naval architect who had drawn the specifications for the installation of the flooring and had supervised the work. He testified at some length with respect to the material known as rubber tile which had been used on this floor, saying that it was the most satisfactory type of flooring for such a ship, considering the factors of wear, appearance and safety; that such tile, in its original form without having wax or other dressing applied to it does not have a glossy surface or glossy appearance; that gloss is associated with products added to the surface of tile such as wax, but as for the tile itself, it does not have a glossy surface,—a glossy appearance on rubber tile comes from waxing and dressings.

The naval architect also testified that while the rubber tile was impervious to water, yet floor dressings which contained petroleum products would penetrate minutely into the surface. By minutely he meant the matter of a

---

"Q. And was that the same situation that you encountered this day on the landing that you fell? A. Yes."

2. "Q. Do you know what the floor covering was on the landing between A and B decks on the midships stairway? A. No.
"Q. No recollection at all? A. No.
"Q. Do you remember what color it was? A. No.
"Q. Do you remember whether it was dark or light? A. No, sir.
"Q. You have no recollection of that floor landing at all? A. No, sir.
"Q. That is the floor covering on the landing in either location? A. No, sir.
"Q. Why do you say it was slippery if you have no recollection of it? A. When I looked when I was taking my last step on the steps there my eyes looked down there to see if I had another step to go down. I didn't look for color.
"Q. Sir? A. I didn't look for color or anything; I knew it was awfully slippery.
"Q. That was your mental impression? A. That's right.
"Q. From looking at it? A. My impression from looking at it.
"Q. It had a dull gloss to it, didn't it? A. No, it was high and shiny."

3. When read in connection with the interrogatory this includes the landing.

"thousandth of an inch or so." Neither party produced any evidence as to the character or contents of the Franklin's Rubber Gloss Cleaner or the Ajax Cleanser that was used on the stairway and landings. The man who was second steward on the ship at the time of the accident and who had charge of the crew that cleaned the decks and stairways testified that the porters who cleaned the stairs and landings used a "detergent" in the water. "All they use is hot water and a detergent and nothing else to mop up the stairways and landings."[4]

The question is whether the evidence here described is such that a jury could properly draw an inference of negligence and of failure to exercise that degree of care which the law imposed upon the defendant. In discussing the question of the duty which the defendant owed to its passengers, all of the parties agreed that the law of California is to be applied. The trial court made a like assumption. We find it unnecessary to indicate any view as to whether in this the parties were correct for as we see it, no matter which law applies, the rule is the same, whether that of California, or that of the maritime law.[5]

Plainly enough as a carrier it was the duty of the defendant here to exercise extraordinary vigilance and the highest skill to secure the safe conveyance of the passengers. As stated in Pennsylvania Co. v. Roy, 102 U.S. 451, 456, 26 L.Ed. 141: "For the slightest negligence or fault in this regard, from which injury results to the passenger, the carrier is liable in damages." In California the general rule in this regard has been codified in Civil Code § 2100 to recite that a carrier of persons for reward must use "the utmost care and diligence for their safe carriage."

There is no doubt that there was substantial evidence which the jury was entitled to credit that this floor where Mrs. Allen fell was slippery. Just why it was slippery was not precisely developed, but a substantial amount of testimony was produced to disclose that it was slippery in the sense that it had a tendency to cause slipping. Those who walked on it testified that it was slippery. As Mrs. Allen put it, "I would more or less slip." Johnson said he had the sense of extreme caution as he traversed the landing; that it was "quite slippery"; that it looked slippery and rather highly polished. To Mr. Allen it was "high and shiny"; "very highly polished and very smooth"; and as he stepped on it on that occasion it was "just as shiny, high glossed as anything could be."

It is suggested that this testimony that the floor was slippery must be disregarded, first, because it is not shown that the witnesses who testified concerning it had the requisite knowledge to give

---

**4.** The record leaves something to be desired in the way of certainty as to just what was applied to this floor. Not only is there no testimony as to the composition of Franklin's Rubber Gloss Cleaner and Ajax Cleanser, but there is nothing to show these were the kind of floor dressings to which the naval architect referred when he spoke of floor dressing which contained petroleum products which would penetrate minutely into the surface. Asserting that the system of caring for stairways at the time of the trial was the same as that at the time of the accident, counsel for the defendant called a ship steward who described that method saying that the stairs and landing were swept and mopped with nothing but clear water, no soap, no wax, no patent glosses, no abrasives, no Ajax. A porter who actually did the cleaning and mopping at the time of the accident testified by deposition that he kept the stairs washed and cleaned and used Franklin Cleaners and nothing else.

**5.** As suggested in Chelentis v. Luckenbach S.S. Co., 247 U.S. 372, 38 S.Ct. 501, 503, 62 L.Ed. 1171, even if this is to be regarded as a maritime tort plaintiffs were permitted to bring their suit alleging diversity of citizenship and demanding a jury by virtue of the "saving to suitors" clause of Title 28 § 1333, but it would not follow that defendant's liability would be measured by state law or common law standards. Cf. Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 410, 411, 74 S.Ct. 202, 98 L.Ed. 143; and see Gilmore & Black, The Law of Admiralty, pp. 45–46 and 374 to 384.

such testimony, and second, because such testimony would be a mere opinion which was inadmissible. The contention seems to be that one who merely walks over a floor is not thereby qualified to testify whether it was slippery or not.

■ We think that neither we nor the trial judge would be in a position to lay down any such rule as that. Certainly one who walks over some surfaces such as snow or ice thereby learns (through the sensation communicated to him) enough to testify as to whether the surface was slippery. One who walks over a smooth and shiny floor would appear to be qualified to describe the floor as slippery. It is not beyond belief that one who walks on a surface may obtain sufficient knowledge of that surface by the sense of feeling and observation to tell whether it is slippery or not although he did not actually slip himself. Certainly a pedestrian can tell by feeling the difference between walking upon an ordinary strip of rubber, (not tile), and a strip of linoleum.[6]

■■ We must also reject the suggestion that the testimony that the floor was slippery was not worthy of consideration because it was a mere expression of opinion. It has long since been settled that a witness may give a shorthand rendition of a total situation or a description of collective facts without his testimony colliding with a rule excluding opinions. Cf. Zimberg v. United States, 1 Cir., 142 F.2d 132, 135. The propriety of receiving such descriptions of what the witness has observed is well stated in Healy v. Visalia & T. R. Co., 101 Cal. 585, 36 P. 125, as follows:

"Impressions or sensations caused by external objects are not susceptible of exact reproduction or description in words, nor do they affect every individual alike, and the judgment or opinion of the witnesses by whom they have been experienced is the only mode by which they can be presented to a jury. The question asked of the witness in the present case did not call for an opinion from him depending upon facts which he had subsequently learned, but he was asked to describe the effect of the concussion or jar caused by the car leaving the track, as one of the facts out of which the injury had arisen, and which he had personally observed and felt. * * * Such testimony is competent upon the same principle that permits evidence showing the strength or force of a blow, the distance at which a sound can be heard, or the direction from which it comes, the speed of a horse, the degree of cold or heat, or of light or darkness. In any such instance, a witness who had a personal experience or knowledge of the sensation is competent to testify, although his answer is only his opinion of the matter. The accuracy or strength of his testimony is to be tested by cross-examination." (101 Cal. 589, 36 P. 125)

Dealing with this subject, Prof. McCormick in his handbook on Evidence, (1954) p. 23, says: "It is believed that the standard actually applied by the trial judges of today approaches more nearly the principle espoused by Wigmore, namely, that the opinion should be rejected only when it is superfluous in the sense that it will be of no value to the jury."

Mr. Wigmore has discussed at length this question and has stated with emphasis his view that the opinion rule should not generally exclude a witness' testimony as to such things as the corporal appearance of persons and things; the capacity or tendency of an act or a machine; the probability or possibility of an event, form, identity, speed, time, size, weight and direction. See Wigmore on Evidence, 3d Ed., §§ 1974 to 1978.

Most decisions excluding testimony on these matters under the opinion rule

---

6. A witness' opportunity for observation may well be something that goes to the weight of his testimony rather than to its admissibility. See Schwenger v. Gaither, 87 Cal.App.2d 913, 198 P.2d 108.

Wigmore regards as absurd, saying, in § 1974: "The exclusionary rulings here abound particularly in absurdities and quibbles,—highly fit for cynical amusement, were not the names of Justice and Truth involved in their consideration. One may wonder how long these solemn farces will be perpetrated in our law." His idea of what he considers the appropriate view he illustrates by quoting (in § 1977) from Hardy v. Merrill, 56 N.H. 227, 241, as follows: "All concede the admissibility of the opinions of non-professional men upon a great variety of unscientific questions arising every day and in every judicial inquiry. These are questions of identity, handwriting, quantity, value, weight, measure, time, distance, velocity, form, size, age, strength, heat, cold, sickness, and health; questions, also, concerning various mental and moral aspects of humanity such as disposition and temper, anger, fear, excitement, intoxication, veracity, general character, and particular phases of character, and other conditions and things, both moral and physical, too numerous to mention."

The California courts follow the same rule. Thus in People v. Deacon, 117 Cal. App.2d 206, 255 P.2d 98, 101, a witness was permitted to testify that voices which he heard in the room directly above his own denoted "anger". The court said: "It was allowed under the exception to the opinion rule that laymen can give their opinion on matters of common knowledge that are not susceptible of analysis and detailed description. Anger, like speed or sobriety, must be described as a conclusion. (citing cases) How 'anger' could be evidenced other than by characterizing it as such is difficult to see. Anger is the fact, not the voices that evidence the anger." The court there relied upon the case of Holland v. Zollner, 102 Cal. 633, 36 P. 930, 37 P. 231, which contains an extended and particularly well worded discussion of the subject and accepted a view which agreed with that expressed by Mr. Wigmore.[7]

The California rule favoring the admissibility of such evidence should be applied here under Rule 43(a), Rules of Civil Procedure, 28 U.S.C.A. If a floor is slippery it seems obvious that it would not be practicable to describe its condition otherwise than as a totality of all that the witness observed. The situation is like the illustration given in the California case of Holland v. Zollner, supra. Reference is there made to a witness who tried to state the age of an individual by describing his grey hair, his wrinkled face, his hesitant gait. As the court pointed out, an itemized description of that character still fails to tell the fact and hence the witness is permitted to give an opinion as to the age of the man he has described. As Wigmore says, to exclude such testimony is

7. 36 P. 931: "As a general rule the opinions of nonexpert witnesses are not admissible in evidence. They must state facts, and not opinions deduced from the facts; leaving to the jury, whose province it is, to draw the proper inference from the facts when stated. To this general rule there are a number of exceptions, as clearly defined and as thoroughly established as the rule itself. One only of these exceptions need be mentioned here. It is as follows: 'The opinions of ordinary witnesses, derived from observation, are admissible in evidence, when, from the nature of the subject under investigation, no better evidence can be obtained.' Lawson, Exp. Ev. p. 3. "It is said the exception quoted applies to questions of identity, handwriting, quantity, value, weight, measure, time, distance, velocity, form, size, age, strength, heat, cold, sickness, and health; questions, also, concerning various mental and moral aspects of humanity, such as disposition and temper, anger, fear, excitement, intoxication, veracity, general character, etc. * * * The reason underlying the exception is that, from the very nature of the subject in issue, it cannot be stated or described in such language as will enable persons not eyewitnesses to form an accurate judgment in regard to it. * * * The paucity of language, and the incompetency of witnesses to describe graphically the photograph left upon the mind by observed facts, renders every effort to convey to a jury an adequate conception of the ultimate fact futile, except by announcing the conclusion in their own minds."

absurd. We think here the court properly permitted the witnesses to testify as they did that the floor was "high and shiny", "highly glossy", "shiny high glossed as anything could be", "quite slippery", "I would more or less slip", "it was awfully slippery".

Although the mere fact that Mrs. Allen fell would by itself be no evidence as to why she fell, yet the circumstances of how she fell, when considered with the other evidence in the case, has considerable significance. The witness who saw Mrs. Allen fall, as well as Mrs. Allen herself, testified that as Mrs. Allen walked across the landing, both her feet flew straight out in front of her and up into the air while she fell with a thud upon her back. That is at least some evidence that hers was a slipping fall. This fact distinguishes this case from that of Harpke v. Lankershim Estates, 103 Cal. App.2d 143, 229 P.2d 103, upon which the trial court relied.[8]

▆▆ The evidence does not disclose why the floor was slippery and it was not encumbent upon the plaintiffs to show the reason for its slipperiness. Plaintiffs suggests that the testimony given by the defendant's experts furnished some indication as to the reason for the slipperiness. The naval architect's testimony, referred to above, that the rubber tile if not treated with wax or dressings would have a smooth but not a glossy appearance, suggests that the glossy appearance which the witnesses here described may have been due either to its having been waxed or to its having absorbed some dressing from the Franklin or Ajax cleaners. Of course defendant's witnesses testified that no wax was ever

applied to this floor. The jury were not obliged to accept that testimony. See Dyer v. MacDougall, 2 Cir., 201 F.2d 265, 269. In addition, some inferences may be drawn from the failure to negative the possibility that enough of the cleanser or detergent used was left on the floor, in view of the use only of a damp string mop to wipe it off, to make the tile slippery. Thus, in Irwin v. Pickwick Stages System, 134 Cal.App. 443, 25 P.2d 998, 1001, the court said: "It is elementary that courts are not forced to accept as true a statement of a witness merely because it is uncontradicted. It may be highly improbable and yet incapable of contradiction. If the evidence submitted permits of suspicion as to its verity, if it is apparent that better, and more conclusive, evidence might have been offered, evidence which it was apparently within the power of the party relying upon weaker and less satisfactory evidence to produce, thoughtful and reasonable minds have a right to suspect that, had the best evidence been offered, it would not have sustained the inferior proof. The best evidence would have been clear and conclusive. Such was the case of Judson v. Bee Hive Auto Service Co., supra [136 Or. 1, 294 P. 588, 297 P. 1050, 74 A.L.R. 944], principally stressed by appellant where the original written contract sustaining defendants' contention was before the jury. In each of the cited cases such direct, final, and best proof was in evidence. In these instances there was no room for the application of the wise presumption made a part of our law of evidence by subdivision 7 of section 2061, Code of Civil Procedure: 'That if weaker and less satisfactory evidence is

8. That was a case where the plaintiff who fell down on the stairway of a building testified that she lost her balance and stumbled head first down the stairs. She did not know what caused her to stumble but she said the stairs were slippery. The court held that no inference of negligence rises from the mere proof of a fall; that the burden rested upon the plaintiff to show the existence of a dangerous condition and that the defendant knew or should have known of it; and that no inference of negligence arose merely from the proof that the floor was slippery in the absence of proof of some foreign substance on the floor was known to the owner. The court said [103 Cal.App.2d 143, 229 P.2d 105]: "The minimum duty of a plaintiff is to show that the stairway was in fact unsafe and that she fell because of that condition."

offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust.' " [9]

We are forced to the conclusion that there was sufficient evidence before the jury to permit a finding of fact on their part that the floor in question was sufficiently slippery to make it unsafe and that its maintenance in that condition constituted negligence on the part of the defendant.[10] "If there is substantial evidence both for the plaintiff and the defendant it is for the jury to determine what facts are established." Butte Copper & Zinc Co. v. Amerman, 9 Cir., 157 F.2d 457. "A motion for a directed verdict may only be granted when a verdict the other way would have to be set aside by the court. * * * The same conditions must exist to warrant the granting of a judgment notwithstanding the verdict even where the court reserves ruling on the motion for a directed verdict." Standard Accident Ins. Co. of Detroit, Mich. v. Winget, 9 Cir., 197 F.2d 97, 100.

The evidence shows that the defendant's steward examined and inspected the floor on the morning in question and before the accident occurred. The jury were authorized to infer that the condition of the floor at the time of the accident was the same as it had been throughout that morning when it was inspected and when the work on it had been completed. "Where the condition is of such character that a brief lapse of time would not affect it materially, the subsequent existence of the condition may give rise to an inference that it previously existed." F. W. Woolworth Co. v. Seckinger, 5 Cir., 125 F.2d 97, 98. See Wigmore on Evidence, 3d ed., § 437.

In Nicola v. Pacific G. & E. Co., 50 Cal. App.2d 612, 123 P.2d 529, 531, the court was commenting upon the evidence in a case in which a plaintiff invitee claimed to have slipped and fallen upon the defendant's floor. In that case the evidence of slipperiness was substantially stronger than that present here for there was evidence that other witnesses had previously slipped upon the same floor. The court had occasion to comment upon the evidence and its sufficiency in certain particulars. It said: "It is the degree of slipperiness that determines whether the condition is reasonably safe. This is a question of fact." The court also said: "While appellants' janitor testified that he had not used wax on the floor within six weeks before the accident, there was other evidence from which it could have been inferred that the slippery condition of the floor on the day of the accident was due to wax or perhaps soap that had been used on it."

We are satisfied that the California court, in view of the high degree of care which defendant was required to exercise in respect to its passengers, would hold the evidence here sufficient to carry the case to the jury. We also note that while that circumstance would not in our opinion alter the result here, yet "the sufficiency of certain evidence to raise

---

9. The defendant called the expert witness previously mentioned for the purpose of giving technical information as to the rubber tile. There was no evidence offered as to the chemical contents of Franklin's Cleaner or Ajax Cleanser, as to whether these contain petroleum products or whether they were the detergents referred to in the testimony of defendant's employees. Whether such evidence if produced would have shown that they accounted for the high gloss or the slipperiness is of course unknown.

10. Appellee contends that it cannot be inferred from the testimony of the naval architect that something had been added to the surface of the rubber tile in order to make it glossy. The argument is that when this witness referred to "glossy" appearance he was using that term in a different sense than did the witnesses who described the appearance of a floor as being glossy. Of course the jury might have inferred had they chosen to do so that such was the case; but there is no evidence in the record to disclose that the term was used in this different sense, and we think the conclusion as to the relationship between the testimony of the lay witnesses and that of the expert witnesses was one of fact for the jury.

a question of fact for the jury * * * should not be controlled by state law." 5 Moore's Federal Practice, 2nd ed., § 38.10, p. 102.[11]

In this case the verdict of the jury was returned on November 23, 1956. The order of the judge granting the motion for judgment notwithstanding the verdict was not filed until December 26 or slightly more than a month later. The order indicates upon its face that at that time the trial judge was under the mistaken apprehension that all evidence to the effect that the floor appeared to be "slippery" had been stricken from the record. As we have shown, that statement is incorrect and it would have been error to exclude such testimony. This may in part account for the different view which we take from that of the trial judge with respect to the sufficiency of the evidence here.

The judgment is reversed and the cause is remanded with direction to enter judgment upon the verdicts.

Order upon Petition for Rehearing

PER CURIAM.

 The petition for rehearing would have this court modify its opinion to permit the district court to consider anew the defendant-appellee's motion for new trial. Our decision does not reach that question. The district court will be free upon remand to consider said motion upon its merits. For the reason that the petition requests something that is unnecessary the petition is denied. This court does not intend to intimate that the said motion should or should not be granted.

[11]. Pogue v. Great Atlantic & Pacific Tea Co., 5 Cir., 242 F.2d 575, 582: "The kind of jury trial to which the parties are entitled in Federal Courts under Rules 38 and 39 of the Federal Rules of Civil Procedure, 28 U.S.C.A., is that preserved by the Seventh Amendment to the Constitution, to which the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, is of course subservient. Wright v. Paramount-Richards Theatres, 5 Cir., 198 F. 2d 303, 305; Reuter v. Eastern Air Lines, 5 Cir., 226 F.2d 443, 445; Reynolds v. Pegler, 2 Cir., 223 F.2d 429, 433, 434."

These cases may explain the extent to which the Supreme Court has indicated it is prepared to go in sustaining the sufficiency of the evidence to support a jury verdict in cases where the inferior federal courts have set verdicts aside. See for example the following, none of which are F.E.L.A. cases: Williams v. Carolina Life Insurance Co., 5 Cir., 210 F.2d 477, reversed at 348 U.S. 802, 75 S.Ct. 30, 99 L.Ed. 633; Atlantic Coast Line Railroad Co. v. Swafford, 5 Cir., 220 F.2d 901, reversed at 350 U.S. 807, 76 S.Ct. 80, 100 L.Ed. 725; Eastern Air Lines, Inc., v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, reversed at 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796; Phillips Petroleum Co. v. Gibson, 5 Cir., 232 F. 2d 13, reversed at 352 U.S. 874, 77 S.Ct. 16, 1 L.Ed.2d 77.