RENDERED:  AUGUST 22, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0307-MR

LOWE'S HOME CENTERS, L.L.C.                                APPELLANT


APPEAL FROM MONTGOMERY CIRCUIT COURT
v.          HONORABLE ELIZABETH H. DAVIS, JUDGE
ACTION NO. 22-CI-90079


FLOYD ARNOLD, MONTGOMERY
COUNTY PROPERTY VALUATION
ADMINISTRATOR; KENTUCKY
CLAIMS COMMISSION, BOARD OF
TAX APPEALS; AND
MONTGOMERY COUNTY BOARD
OF ASSESSMENT AND APPEALS                               APPELLEES


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, ECKERLE, AND MᶜNEILL, JUDGES

ECKERLE, JUDGE:  Appellant, Lowe's Home Centers, L.L.C. ("Lowe's"), seeks

reversal of a judgment of the Montgomery Circuit Court affirming a final order of

the Appellee, the Kentucky Claims Commission, Board of Tax Appeals (the

"Board"), which also upheld the assessment of Lowe's property by the

Montgomery County Property Valuation Administrator (the "PVA"). We have given the matter a thorough review and careful consideration, both of the briefs and oral argument. We find that as a matter of procedure, the Board conflated the parties' burdens and misapplied the presumption of validity as to the PVA's assessment, failing to account for competent rebuttal evidence, and the Circuit Court failed to address that error. Further, and substantively, we hold that the Board's ultimate decision to uphold the assessment was based upon an incorrect standard and was not supported by substantial, compelling evidence.

Both parties agree that the PVA's continued use of 2008 values of the then-brand-new building for 2020 assessments over a decade later was improper. We further conclude that the Board's rejection of Lowe's evidence of comparable sale values, and the Board's uncritical adoption of the PVA's evidence of hypothetical leased values without any adjustments was not based upon competent or substantial evidence. Rather, because the PVA's expert relied on inapplicable and inaccurate methodologies and assumptions, and Lowe's expert based her opinions on true comparables in the open free market as Kentucky law requires, we conclude that the evidence compelled a finding in Lowe's favor. Hence, we reverse and remand with directions for the Board to adopt the assessment valuation supported by Lowe's expert.

## I.  Factual and Procedural Background

Lowe's owns and occupies 550 Indian Mound Drive, Mount Sterling, Kentucky (the "Property"), in Montgomery County.  The Property consists of 14.28 acres of land and includes an approximately 111,196-square-foot, free-standing, retail store, along with surrounding improvements.  The building and improvements were constructed in 2007.  As a matter of significant, undisputed fact, Lowe's has never leased its owner-occupied, built-to-suit Property.  It has always owned the Property in fee simple.  There are no other national, home-improvement stores located in the entire county.

In 2008, the PVA first assessed the Property and arrived at a value of $8,195,000 using the Cost Approach[1] with 2006 data.  As the building construction was brand new, the PVA did not depreciate any value.  However, the PVA continued to use this exact same value for tax purposes with no depreciation for the next 13 years, when Lowe's challenged the assessment in 2020.  Stated differently, and with emphasis, the PVA did not reassess the property for over a decade.  It may have re-evaluated it after its expert's appraisal solely after the litigation commenced, but again, it did not re-assess the Property ever.  Lowe's sought

---

[1] Kentucky Revised Statute ("KRS") 132.191(2)(a) defines "cost approach" as "a method of appraisal in which the estimated value of the land is combined with the current depreciated reproduction or replacement cost of improvements on the land[.]"

review of the assessment before the Appellee, Montgomery County Board of Assessment Appeals, which ratified the PVA's assessment.

Lowe's then filed a petition of appeal from this decision with the Board on September 21, 2020.[2]  Lowe's first asserted that it had provided evidence that the fair market value of the property was no more than $5,000,000.  Lowe's later reduced the claimed value to approximately $4,000,000 with an expert's opinion.  Lowe's argued that the PVA's valuations were improperly based on the value to a particular user rather than to the general market for unencumbered real property.

On October 27 and 28, 2021, the Board conducted an evidentiary hearing, noting that the PVA's assessment constitutes *prima facie* evidence of value.  KRS 49.220(5).  For its case, Lowe's called Kelly Fried ("Fried").  The Board qualified Fried as an expert, noting both her compliance with the Uniform Standards of Professional Appraisal Practice and her decades-long experience and qualifications, including as a Member of the Appraisal Institute.  The Board classified her as competent to provide opinions as to the fair cash value of the

---

[2] On August 31, 2020, Governor Andy Beshear issued Executive Order 2020-708, which abolished the Kentucky Claims Commission and reassigned its review functions.  Relevant to this appeal, the Order re-established the Board of Tax Appeals as part of the Office of Claims and Appeals within the Public Protection Cabinet.  The General Assembly approved this reorganization through the passage of 2021 *Ky. Laws* Ch. 185, which became effective on June 29, 2021.  The Board now has the authority to hear and determine appeals from final rulings, orders, and determinations of any revenue and taxation agency.  KRS 49.220(2).

Property.  Fried prepared a market value of the fee simple interest in the Property because Lowe's had owned and occupied it.  Fried calculated the value of the property based on a Sales Comparison Approach,[3] using what is commonly called "comparables" or "comps" and an Income Capitalization Approach.[4]  Both approaches are statutorily recognized.  KRS 132.191(2).  Fried's comparables included four sales of unleased stores and three sales of leased stores.  She adjusted each sale to account for differences in the location and size of the real property and the conditions of the buildings.  Significantly, she adjusted the leased properties' values to remove the values of the leases themselves, as there was no lease on Lowe's Property.  She used four large rental properties to derive a market rental rate.  Fried's detailed analysis arrived at a final value, as of January 1, 2020, of $4,000,000.

The PVA called three witnesses at the hearing:  Floyd Arnold, the elected Montgomery County PVA ("Arnold"); Robert Day, a manager of the Department of Revenue's Office of Property Valuation ("Day"); and its own expert, Keith Mays ("Mays").  Arnold testified that since the original assessment

---

[3] KRS 132.191(2)(c) defines "Sales Comparison Approach" as "a method of appraisal based on a comparison of the property with similar properties sold in the recent past[.]"

[4] KRS 132.191(2)(b) defines "income approach" (or "Income Capitalization Approach," as used by the experts in this case) as "a method of appraisal based on estimating the present value of future benefits arising from the ownership of the property[.]"

of the brand-new building and land in 2008, he and his office had not revalued the property, but had simply left untouched the same assessed value for 13 years. His only, decade-old assessment was based on the Cost Approach, but he did not renew or update any costs for replacement or reproduction each year for any improvements. Fried testified that this Cost Approach was not relevant here because of the Property's age. Mays, the PVA's own expert, would testify to the same.

Day testified that he performed the original valuation of the Property in 2008 using the Cost Approach, and again he valued the Property in 2020, but using the Marshall & Swift valuation service[5] for building costs. Day's 2020 report estimated a replacement cost of the building at $7,276,629.99, with a depreciated value of $5,992,000. Thus, even Day, who was qualified as an expert during the hearing, did not accept the PVA's $8,000,000 figure. Day's valuation also only included the building and not the land. But the Board allowed Day to testify as a PVA witness about a cost calculation that the PVA had not used as part of the basis of its assessment. Finally, Day conceded that the PVA failed to make

---

[5] The Marshall & Swift Valuation is a commercially-available service provided by CoreLogic, Inc. The service, which employs the Cost Approach, is widely used by governmental agencies, including the Revenue Cabinet, to place a value on real properties for tax-assessment purposes. It is also widely used to value real properties for insurance, accounting, tax, construction, banking, and financial purposes. *See* https://www.cotality.com/products/marshall-swift (last accessed Jun. 24, 2025).

the required deductions for depreciation, deterioration, and obsolescence in the assessments each year.

Mays testified that he applied a Sales Comparison Approach and an Income Capitalization Approach to place a value on the Property (as did Fried for Lowe's). Using the Sales Comparison Approach, Mays testified that he arrived at a value of $10,750,000. However, Mays only compared six properties that Lowe's leased – and did not own – in different states around Kentucky. He made no adjustments for these leases; he did make other adjustments to the numbers without explanation. And using the Income Capitalization Approach, Mays reached a value of $10,550,000. He did so by using seven, exclusively leased properties, six of which were built-to-suit and many of which were lease renewals. Again, he made no adjustments to account for the undisputed fact that Lowe's did not lease the Property. In reconciling these two approaches, Mays arrived at a value, as of January 1, 2020, of $10,550,000. In his testimony, Mays had to adjust his figures downward because he had used the wrong square footage in his report.[6]

---

[6] In his report, Mays arrived at a value of $11,750,000 using the Sales Comparison Approach, $11,400,000 using the Income Capitalization Approach, and $11,400,000 after reconciling these values. But in his testimony, Mays admitted that he based these values on an incorrect calculation of the building's square footage, and he provided the revised values.

In an Order entered on April 27, 2022, the Board accepted Arnold's 13-year-old assessment of the Property at a value of $8,195,000. It thus rejected both experts' valuations, as well as Day's testimony.

The Board first concluded that Lowe's failed to offer competent evidence to rebut the PVA's assessment value. The Board heavily criticized Fried's comparison of the sales of four vacant stores. The Board also took issue with Fried's application of the Income Capitalization Approach. Thus, the Board determined that Fried's testimony did not constitute reliable or competent evidence to rebut the PVA's valuation.

The Board also found that, even if Lowe's had overcome the presumption, the PVA's proof was more persuasive. The Board preferred Mays' comparables, which all contained leases, even though Lowe's Property does not. Most notably, the Board emphasized that none of Mays' comparable properties were vacant as of the valuation date. Thus, the Board concluded that, despite exceeding the PVA's assessment by over $2 million, Mays' opinion supported the assessed value.

Lowe's sought review of the Board's decision in the Montgomery Circuit Court, pursuant to KRS 49.250 and KRS 13B.140. After reviewing the evidence, the Circuit Court concluded that the Board's rejection of Fried's valuation and its acceptance of Mays' valuation was supported by substantial

evidence.  This appeal followed.  Additional facts will be set forth below as necessary.

## II.  Analysis

KRS 13B.150(2) sets forth the standard of appellate review of factual determinations from a final order of an administrative agency as follows:

> The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.  The court may affirm the final order or it may reverse the final order, in whole or in part, and remand the case for further proceedings if it finds the agency's final order is:
>
> (a) In violation of constitutional or statutory provisions;
>
> (b) In excess of the statutory authority of the agency;
>
> (c) Without support of substantial evidence on the whole record;
>
> (d) Arbitrary, capricious, or characterized by abuse of discretion;
>
> (e) Based on an *ex parte* communication which substantially prejudiced the rights of any party and likely affected the outcome of the hearing;
>
> (f) Prejudiced by a failure of the person conducting a proceeding to be disqualified pursuant to KRS 13B.040(2); or
>
> (g) Deficient as otherwise provided by law.

And by the same statutory authority, in matters of law the Court of Appeals reviews *de novo* the agency's decisions as to purely legal issues. KRS 13B.150(3).

Legal determinations of the agency are thus afforded no deference by this Court. With respect to factual disputes, we will uphold the agency's decision if there was substantial evidence of probative value upon which the agency could base its decision, and the agency applied the correct rule of law to the facts before it. *Kentucky Unemployment Ins. Comm'n v. Murphy*, 539 S.W.2d 293, 294 (Ky. 1976). "'[S]ubstantial evidence' means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998) (citations omitted).

On appeal, Lowe's asserts an error of law with regard the statutory presumption of validity of the PVA assessment and the shifting, legal burdens applied to the parties. For its second argument, Lowe's cites an error of fact and law in that the Board's final determination lacked the support of substantial evidence of the whole record. Lowe's is correct on both grounds, and the Board's decision – as well as the Circuit Court's affirmance of it – cannot stand and must be reversed. We will address each in turn.

### A.    Presumption of Validity and the Parties' Shifting Burdens

In resolving disputes of this nature, KRS 49.220(5) provides that "[t]he assessed value shall be *prima facie* evidence of the value at which the property should be assessed."  The Kentucky Supreme Court has interpreted this provision as granting a presumption of validity to the estimated property tax assessment and placing the burden of establishing that the assessment was incorrect upon the taxpayer.  *Revenue Cabinet, Commonwealth of Ky. v. Gillig*, 957 S.W.2d 206, 209-10 (Ky. 1997).

This Court has further explained that this presumption of validity is not evidence, but it "serves in place of evidence until the opposing party comes forward with his proof, whereat it disappears.  It has no weight as evidence and is never to be considered in weighing evidence."  *Kroger Ltd. P'ship I v. Boyle Cnty. Prop. Valuation Adm'r*, 610 S.W.3d 332, 337 (Ky. App. 2020) (quoting *Evans Oil & Gas Co. v. Draughn*, 367 S.W.2d 453, 454 (Ky. 1963), and *People ex rel. Wallington Apartments v. Miller*, 288 N.Y. 31, 33, 41 N.E.2d 445, 446 (1942)).  Once the taxpayer provides competent evidence to rebut the presumption, the PVA has the burden of going forward with sufficient evidence to support the assessment.  *Id.*

Here, the PVA takes the position that the Board had the discretion to assess the weight and credibility of Fried's testimony and opinions to determine

-11-

whether Lowe's successfully rebutted the presumption. In response, Lowe's argues that Fried's testimony was sufficient to rebut the presumption that originally existed in favor of the PVA's assessment, and that the Board improperly assessed the weight and credibility of her testimony afterward.

The preliminary inquiry for this Court is to determine what evidence qualifies as "competent" such that it is sufficient to rebut the presumption in favor of the PVA's assessment. In *Boyle*, this Court first looked to the definition of "*prima facie* evidence," which means, "evidence which if unrebutted or unexplained is sufficient to maintain the proposition, and warrant the conclusion to support which it has been introduced but it does not shift the general burden of proof, and stands only until the contrary is shown." *Prudential Ins. Co. of Am. v. Tuggle's Adm'r*, 254 Ky. 814, 72 S.W.2d 440, 443 (1934) (citation omitted). *See also* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "*prima facie evidence*" as "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced").

In light of this definition, the Court in *Boyle* held that the presumption was rebutted once the taxpayer presented expert testimony supporting a contrary value and evidence that casted doubt upon the sufficiency of the PVA's assessment. 610 S.W.3d at 337. In *Boyle*, the PVA presented no expert testimony either supporting its assessment or challenging the conclusions of the taxpayer's

-12-

expert. *Id.* at 337-38. Indeed, the PVA there only presented the summary valuation made by an employee of the Revenue Cabinet. Moreover, the PVA did not call that employee to testify regarding his basis for arriving at that valuation. *Id.* at 338. In the absence of any competent evidence, this Court concluded that the Board could not disregard the taxpayer's expert testimony without providing any basis for rejecting his conclusions. *Id.*

Kentucky case law does not delineate the type or amount of proof with exaction that a taxpayer must present to rebut the statutory presumption of an assessment's validity. But considering the nature of *prima facie* evidence, we conclude that, for rebuttal, Lowe's bore the burden of producing competent and reliable evidence to rebut the presumption of the assessment's validity created by KRS 49.220(5). But while Lowe's had the burden of *production* of this evidence, it did not carry the burden of *proof or persuasion* at that point. Rather, precedent is clear that once Lowe's produced the evidence, the burden shifted back to the PVA to produce evidence in support of the assessment. *Boyle*, 610 S.W.3d 337-38.

In this case, Lowe's produced competent, reliable evidence in rebuttal in the form of the testimony of Fried, who the Board found to be an expert qualified to render an opinion regarding the value of the Property. Furthermore, as

noted, Fried's valuations were based upon a Sales Comparison Approach and an Income Capitalization Approach, the very methods authorized by KRS 132.191. We find that, as a matter of law, the Board misconstrued the presumption by requiring Lowe's to prove its case during the *prima facie* phase.

Under these circumstances, we conclude that Lowe's met its initial burden under the law of producing, or presenting, expert testimony to rebut the presumption favoring the PVA's assessment. Lowe's production of Fried's detailed testimony, analysis, and report was more than enough to meet its burden and overcome the statutory presumption.

Moreover, every witness maligned the PVA's assessment here, even those that the PVA called on its behalf. Both Day and Mays criticized the Cost Approach that the PVA continued to use for a 13-year-old Property without any depreciation whatsoever. There is no authority for the continued treatment of Property as brand new for over a decade, and the PVA's own witnesses admitted as much. If the PVA's witnesses and Fried's testimony were deemed insufficient to rebut a presumption, as they were here, we question what type of proof could ever be sufficient.

Again, the presumption is not evidence under the law; only the proof in rebuttal is. And Lowe's considerable rebuttal was solid. The PVA's labelling at oral argument of Lowe's proof as "compelling but non substantial" is a distinction

-14-

without a difference. The Board committed clear error in concluding that Lowe's failed to rebut the presumption, and that the PVA's old assessment was entitled to retain a presumption of correctness. As a matter of law, Lowe's expert analysis in rebuttal alone was sufficient for the case to proceed. Lowe's satisfaction of this duty was imminently apparent, and the Board had no legal basis to determine otherwise. The Circuit Court should not have affirmed this irregularity.

Once Lowe's met its burden, the Board was then required to place the burden on the PVA to produce evidence in support of the assessment. Again, the Board not only conflated the burdens here, but also failed to shift the burden from Lowe's to the PVA.

This failure to recognize which party should be producing what evidence and when contaminated the proceedings and the orderly production of proof. But, if we segregate the evidence – which the Board should have done but did not do – after Lowe's met its burden of rebutting the presumption, the burden then shifted to the PVA to produce substantial evidence in support of its assessment.

Only then should the Board have addressed the weight and credibility of Fried's testimony as part of its ultimate determination of the value of the Property. While the Board did admit the PVA's proof in the form of three witnesses, it did so in an improperly combined fashion. It weighed the evidence

submitted by both parties at the outset to determine if one party rebutted the presumption. This weighing of the proof should have only occurred if the Board found that Lowe's rebutted the presumption.

But it found that Lowe's failed to rebut the presumption. If that were true, the PVA should not have been required to submit any evidence. These fundamental, legal errors in the proceedings below warrant reversal.

### B. Substantial Evidence

As Lowe's clearly presented sufficient evidence to rebut the presumption, the burden should have shifted to the PVA, which the Board should then have allowed to submit evidence. As the evidence did come in anyway (improperly), Lowe's still retained the ultimate burden of proof and risk of non-persuasion. *Boyle*, 610 S.W.3d at 337. Because the Board allowed all of the convoluted proof into the proceedings, we will address it substantively here.

Unlike in *Boyle*, the PVA in this case responded with evidence, through the testimony of three witnesses, to support a higher valuation than what Lowe's had offered in rebuttal. Mays provided specific challenges to the assumptions that Fried had relied upon in reaching her valuation. However, the PVA's proof brought substantial problems of its own. And Fried substantially and sufficiently, if not conclusively, countered both Day's calculation using the Cost Approach and Mays' calculations using the Sales Comparison and Income-

Capitalization approaches, as well as Arnold's entire approach to continued assessments of the Property.

### 1. The PVA's Cost Approach Valuation

Likely in part because of the erroneous manner in which the proceedings were conducted, the Board and Circuit Court overlooked an initial key point here. Each expert witness agreed that the Cost Approach is not an appropriate method to value a 13-year-old Property. Indeed, we have seen no evidence supporting the conclusion that the PVA can properly carry forward a decade-old valuation for a Property that includes a building and retail with no accounting for applicable depreciation. Even Arnold admitted that he had not updated or re-evaluated the value of the Property at any point during this period since the time that it was brand new. Yet the Board somehow rejected the testimony of all three of the PVA's own witnesses, as well as Lowe's witness, to arrive at a conclusion that the PVA's "value" is correct. There is no evidence, let alone substantial evidence, to support this finding.

Under Kentucky law, the duties of the PVA on reassessments are clear and mandated: "Each parcel of taxable real property or interest therein subject to assessment by the [PVA] shall be revalued during each year of each term of office by the [PVA] at its fair cash value in accordance with standards and procedures prescribed by the department . . . ." KRS 132.690(1)(a). The PVA admitted that

-17-

he did not comply with this duty. And his was not a one-time neglect. Here, the PVA violated this statute again every single year for 13 years by failing to reassess the Property at all. It still has not done so to this day. The PVA simply carried forward the numbers from 2008 each year without any revaluation whatsoever. This means that he treated a 13-year-old building as if it were brand new. He never depreciated any amount.

Both experts, including the PVA's own, criticized this approach. Both experts agreed that a Cost Approach is thus not appropriate under these circumstances.

The very issue in this case is the Property's Fair Cash Value, which simply means that which a seller would willingly take, and a buyer would willingly pay. This value must of necessity be current and not stale. Both experts panned the use of the outmoded, aged figure. And under Kentucky precedent, the method of the PVA's assessment must be "fairly designed for the purpose of reaching, and reasonably tends to reach, an approximation of the fair voluntary sale price." *Fayette Cnty. Bd. of Supervisors v. O'Rear*, 275 S.W.2d 577 (Ky. 1955).

The statute requires that properties be "revalued" in "each year." KRS 132.690(1)(a). There simply was no revaluation here ever by the PVA. This failure repeated itself year after year. Thus, the figures used in the PVA's Cost Analysis were undisputedly older than 2008. There was no update or adjustment

made to the numbers at all. And yet the Board, and the Circuit Court, affirmed the PVA's valuation. This finding is simply not based upon substantial evidence.

**2. The PVA's Sale Comparison and Income Capitalization Valuations**

Even though the PVA's assessment is unsubstantiated, the Board chose to leave it in place. But it also rejected all of the final valuation figures submitted by both experts using the Sales Comparison and Income Capitalization Approaches and by the Revenue Cabinet employee. It arrived at that point in large part by using Mays' opinion to discredit that espoused by Fried. Nonetheless and curiously, the Board still did not accept Mays' conclusion of value. We must address the Board's remaining findings regarding the evidence as a whole.

This is a significant case involving a lot of money. Both Day's and Mays' calculations and opinions contradicted the PVA's assessment by a substantial degree. Arnold's final figure was approximately $8,000,000. Day's number was approximately $6,000,000. And Mays opined that the value was approximately $10,000,000. These numbers – all offered by the PVA's own witnesses in evidence – are millions of dollars apart. And they are millions of dollars higher than Lowe's sole proof of approximately $4,000,000. These large,

divergent numbers and discrepancies are real and significant and should have given both the Board and the Circuit Court pause.[7]

The PVA stated at oral argument that its expert's far-higher figure shows that the PVA's assessment was not overvalued. But neither the Board nor the Circuit Court questioned how the PVA's value could be presumed correct or valid when none of its own three witnesses found it to be accurate.

Boards and Courts must make decisions as to "the weight of the evidence on questions of fact." KRS 13B.150(2). Lowe's is not asking this Court to re-weigh the evidence, and we are not permitted to do so. However, the evidence itself must obviously be relevant, competent, and reliable. This Court, in appellate review, must "reverse the final order, in whole or in part . . . if it finds the agency's final order is . . . [w]ithout support of substantial evidence on the whole record; [or] [a]rbitrary, capricious, or characterized by abuse of discretion[.]" *Id.*

The Constitution of our Commonwealth clearly mandates the type of evidence required to assess property tax. For purposes of taxation, property is

---

[7]  The appointment of a neutral expert might have been preferable, or a mediation between the parties and their experts. At this point, however, we must base our opinion on the record we have.

And the PVA's allegation that it is in a David versus Goliath position due to the financial ability of Lowe's to continue to fight this case is as irrelevant as it is incorrect. The PVA has all the resources of the government to continue this litigation. It has employed experienced Assistant County Attorneys from different parts of the state to argue its case. It should not be heard to complain that it is not fighting an individual homeowner's assessment here.

-20-

assessed based on its fair cash value, "estimated at the price it would bring at a fair voluntary sale[.]" KY. CONST. § 172.

Here, the evidence that the Board accepted, and the Circuit Court affirmed, was not based on any sale at all. Rather, it was solely derived from Mays' use of leased properties in both his Sales Comparison and Income Capitalization Approaches. In other words, it was not based upon fair and voluntary sales in the free market, as required by our Constitution. And Lowe's does not lease the Property. Worse still, Mays did not make any adjustments to these leases that are not proposed for the Property to account for factors impacting value, such as lease terms and duration.

Mays used widely disparate, leased properties in both his Sales Comparison and Income Capitalization Approaches. For his Sales Comparison approach, Mays used six other Lowe's stores. However, each of those properties was subject to long-term leases to Lowe's. But there is simply no evidence to support his assertion that Lowe's would continue to occupy the Property upon a fair and voluntary sale. In fact, his claim is contrary to the only evidence of record. Thus, Mays' comparisons are of dubious, if any, usefulness because they all rest on the unsupported assumption of a lease.

Mays assumed a fact not in evidence – that any future sale would be subject to a lease to Lowe's or to a similarly creditworthy tenant. Mays took the

-21-

position that the Property's value would be enhanced if sold subject to a lease agreement to a long-term, creditworthy tenant, like the other stores used in his comparables – a sale with a lease that is not anticipated here. More important, Mays' opinion is simply not based upon a sale at all that is unencumbered by his unilateral creation of a lease where none exists. His resulting attempt to estimate what the market rent for the Property might be, which led him to reach a "value" of $10,750,000, is manufactured and not based upon the evidence. We cannot find, and the Board and the Circuit Court should not have found, substantial evidence to support his numbers.

Mays' entire approach is based upon leases to Lowe's. But this analysis suffers from a critical mistake. Mays determined the value of a lease to *Lowe's* in particular where a *Lowe's* building and business was already in place. Instead, Mays should have determined the free market and fair cash value of a lease to a buyer in general in Mt. Sterling. Our very Constitution requires the assessment to be "estimated at the price it would bring at a fair voluntary sale[.]" KY. CONST. § 172. Nowhere in that requirement is a particular buyer listed or a lease mandated.

Further, the PVA stated at oral argument that Mays valued the Property at its highest and best use by valuing a lease to Lowe's. But Lowe's is

-22-

using the Property now as it deems to be at its highest and best value:  as an owner-occupied, non-leased Property.

Moreover, and importantly, Mays did not make appropriate adjustments for vacancy or collection loss due to the creditworthiness of the lessees in his Sales Comparison Approach.  In his Income Capitalization Approach, he used surveys that occurred substantially after the assessment date to reach a "value" of $10,550,000, which he used as his final figure.  He also made lesser adjustments for the Lowe's stores.

We are aware that we have previously overturned a Board's acceptance of a PVA expert's opinion of value based upon comparing a property to unadjusted leases because it lacked substantial evidence.  *Kroger Ltd. P'ship I v. Jenkins*, No. 2019-CA-001133-MR, 2020 WL 4554866 (Ky. App. Jul. 17, 2020).

Of course, as the Board and the Circuit Court recognized, *Jenkins* is an unpublished opinion and, therefore, it is not binding authority.  Rule of Appellate Procedure ("RAP") 41.[8]  We may, however, consider the *Jenkins* case for its persuasive value.  *See Turner v. Commonwealth*, 538 S.W.3d 305, 313 n.15 (Ky. App. 2017).[9]  This is particularly true where, as here, there is a dearth of

---

[8] Lowe's cites this unpublished case pursuant to RAP 41(A).

[9] We also note that the Board cited other states' unpublished decisions, which are not as persuasive as our own.

-23-

published, Kentucky case law on point.  *Jenkins* is also factually similar to the case *sub judice*.  Both parties cited and discussed it in briefing and at oral arguments.  Thus, while we are not required to follow it, we will not ignore it.  The reasoning in *Jenkins* is sound.  And there is no contrary, Kentucky law in existence.

There, the PVA's appraiser used unadjusted sales of leased properties, as well as other properties that were sold as part of an investment portfolio.  2020 WL 4554866, at *10.  The case solely involved the Sales Comparison Approach and not the Income Capitalization Approach.  This Court did not affirm the Board's or Circuit Court's countenance of the PVA's expert's reliance on the sales of leased properties to buttress the assessment of an unleased property.  We specifically criticized the expert's reliance on unadjusted leased properties as comparables.  *Id.* at *9.  We also explicitly held that leased properties cannot properly and exclusively be used as comparables to set values for unleased properties when determining the propriety of assessments unless adjustments are made to account for the aforementioned variables.  *Id.*  Our Court concluded that, without making any adjustments accommodating the separate value of the leases, the testimony by the PVA's expert did not constitute substantial evidence upon which to uphold the assessment.  *Id.*; *see also Helman v. Kentucky Bd. of Tax Appeals*, 554 S.W.2d 889 (Ky. App. 1977).  This Court expressly deemed the

Board's reliance on the PVA's expert as "without substantial evidence," and we thus reversed the Circuit Court's affirmance. *Jenkins*, 2020 WL 4554866, at *10.

In *Jenkins*, as is the case here, a PVA exclusively offered evidence of leased property in an attempt to support an assessment of unleased property. And likewise, the taxpayer there and here offered some evidence of unleased property. We recognize, however, that, unlike the appraiser in *Jenkins*, Mays made some adjustments to the valuations to account for the leases. However, he made upward adjustments, making assumptions without foundation that a sale would include a lease, which of course did not exist at the time of valuation. Thus, although the facts of *Jenkins* are not identical, they are substantially similar. And the principles espoused there are applicable to, and resonate with, this case.

To be clear, Lowe's does not argue, and we do not hold, that leased properties may never be used as comparables for unleased properties. In fact, the Income Capitalization Approach anticipates using the value of a potential lease to estimate the present value of future benefits arising from the ownership of the Property. But in such cases, the necessary adjustments must be made in order to render them comparable. *Helman* – a binding case on which the PVA relies – elucidated several necessary factors inherent to making valuations of properties with leases:

> A number of other elements necessarily enter into the value, such as original cost, location, cost and character

-25-

of improvements, rental history, location as to future growth of the adjacent area, sales of adjacent property, sales of comparable property, type of building or property, etc.

Where the income approach is used, all jurisdictions, including Kentucky, require that net income and not gross income be the factor. Other considerations are the terms of the lease, such as requirements for maintenance, alterations or improvements, fixed rent or percentage of sales; prospective earnings as well as past earnings; length or duration of the lease; options at increased or decreased rentals; and, of considerable importance, the type of tenant and his financial stability.

554 S.W.2d at 891. Because the Property here has no lease, we do not have information from the Property itself about market lease rates, rental history, alterations, improvements, lease terms, prospective or past earnings, lease duration, options, types of tenants, creditworthiness, financial stability, or other factors. These complicated and multi-layered elements must be taken into consideration to make the comparisons true. And these calculations are further complicated here because there is simply no leasehold interest to value. Mays himself did not show that the leases he used were made at market rates.

The Board and the PVA cite to another unpublished decision of this Court regarding the appropriateness of comparisons in a build-to-suit lease, noting that such a lease "cannot be disregarded in a fair cash value determination." *Wilgreens, L.L.C. v. O'Neill*, No. 2015-CA-000407-MR, 2016 WL 5319593, at *6

(Ky. App. Sep. 23, 2016).[10]  However, *Wilgreens* is not factually similar to the case *sub judice*, and that non-binding holding actually supports the reasons behind using sales and not leases to assess properties without leases.

This Court in *Wilgreens* declined to adopt a hard and fast rule that leases do not reflect true market value when assessing properties with build-to-suit leases.  *Id.* at *9.  The Court in *Wilgreens* further concluded that,

> To interpret the tax assessment statute as requiring valuation of property in a hypothetical unencumbered form ignores the economic realities of commercial real estate transactions and disregards the General Assembly's decision to include consideration of the present value of all future benefits when using the income approach to property valuation.

*Id.*  Thus, *Wilgreens* stands for the proposition that properties with leases may be used as comparisons for a property that contains a build-to-suit lease if the lease is equivalent – *e.g.*, the lease, regardless of being built to suit is located in a "highly desirable location [and] is capable of generating" comparable income.  *Id.* at *8. But the property at issue in *Wilgreens* involved a lease, and this case does not. And, nowhere in *Wilgreens* did we suggest that the tax assessment statute requires valuation of *unleased* commercial property to be based upon a hypothetical lease.

Our similar conclusion is that unleased properties are comparable to other unleased properties.  Both opinions note the importance of "apples to apples"

---

[10] Again, this unpublished case is cited pursuant to RAP 41(A).

comparisons.  A fair cash value is the method approved by the published, precedential authority of *Boyle*, 610 S.W.3d 337.

Lowe's has the burden of proving that Mays' valuation was so flawed that it could not constitute substantial evidence.  *Jefferson Cnty. Prop. Valuation Adm'r v. Ben Schore Co.*, 736 S.W.2d 29, 30 (Ky. App. 1987).  Under the circumstances of this case as well as binding precedent, and being cognizant of similar reasoning of our prior, unpublished, and non-binding opinions, we find of our own accord here that the overarching, unsupported assumption of the terms of a legal lease when there was none does not constitute substantial evidence to support the PVA's value where the necessary adjustments are unmade.  Mays' testimony is problematic because he failed to value the Property as it actually is and has always been:  unleased.  His assumptions based upon a non-existent, non-adjusted, assumed lease render his opinions unsubstantiated.  He did not make the necessary adjustments for important lease terms, conditions, and considerations, such as length and tenants.  Thus, the evidence offered by the PVA, in its totality, does not constitute substantial evidence.  The Circuit Court should not have relied upon it to affirm the Board, and its decision must be reversed.  The ultimate conclusions reached lacked the support of substantial evidence of the whole record.  The Board's decision was thus arbitrary, capricious, and characterized by an abuse of discretion.  KRS 13B.150(2).

-28-

The Board and Circuit Court did not receive any substantial evidence from Mays or otherwise in support of the PVA's assessment, which was not revalued in over a decade, was stale, contained no depreciation, and constituted an improper use of the Cost Approach, according to even the PVA's own witnesses. Likewise, the Board and Circuit Court did not take any substantial evidence in support of the PVA's assessment from Mays or Day, its own witnesses. Mays opined that the PVA's number was $2 million too low; and Days testified that it was $2 million too high. The Board's and Circuit Court's acceptance of a number that everyone – including the PVA himself – acknowledges violates the Kentucky statute mandating revaluations of fair cash value each year cannot conceivably stand. KRS 132.690(1)(a).

### 3. Lowe's Sales Comparison and Income Capitalization Valuations

Still remaining is the question of the ultimate disposition of this case. The Board was tasked with determining a fair cash value, "estimated at the price it would bring at a fair voluntary sale[.]" KY. CONST. § 172. It was required to set a value for the Property that was consistent with the Kentucky Constitution, statutes, and case law, as well as generally-accepted principals of appraisal. It received relevant, competent, substantial evidence of that value from Lowe's expert appraiser, Fried. Because Fried's was the only evidence left of that nature, and the Board had already accepted it, the Board was required to adopt it.

The Board recognized that Fried is a well-qualified expert from her training, experience, and accreditation. It accepted her opinions into evidence. Fried followed the Uniform Standards of Professional Appraisal Practice and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

Fried prepared an appraisal of the Property's value as of January 1, 2020, based upon the fair cash value of the Property as a fee-simple estate. As noted, Fried prepared valuations based upon the Sales Comparison and Income Capitalization Approaches, as well as a valuation based upon a reconciliation of these two approaches. In her Sales Comparison Approach, Fried used seven properties. Fried explained that she searched for potential comparables using four primary criteria: (1) freestanding retail versus multi-tenant properties; (2) 50,000 square feet or larger in size; (3) sales dates within five years of January 1, 2020; and (4) location in markets similar to that of the Property.

Three of Fried's seven comparables were leased properties, and the remaining four were unencumbered by lease at the time of appraisal. In addition to standard adjustments to account for differences in location, size, and age or condition, Fried made downward adjustments to remove the value of the three leases. These adjustments were designed to reflect the real market condition that the Property is not, and has never been, leased. Fried also made appropriate

adjustments to account for differences in location, condition, or market circumstances. As Lowe's noted at oral argument, Fried also provided upward adjustments for age and condition. These are the adjustments anticipated by *Jenkins* and required under *Helman*.

To arrive at a value under the Sales Comparison Approach, Fried placed greater emphasis on the comparable properties that were similar to the Property in age and condition, as well as properties with more-recent sales. She used the four sales referenced above that were unencumbered by lease and held in fee simple. Based upon her analysis and emphasis, Fried arrived at a value of $35 per square foot, for a rounded value of $3,900,000.

To arrive at a value under the Income Capitalization Approach, Fried chose to use a direct-capitalization analysis instead of a discounted, cash-flow analysis. She reasoned that direct capitalization is more appropriate for properties with relatively-stable operating histories and expectations, and she believed that investors and market participants typically rely more on this method. Under this approach, Fried considered market data in the form of actual, recent leases for comparable spaces and asking rents for competitive properties.

Three of the four properties Fried chose as comparables were parts of larger indoor malls or shopping centers and not free-standing, big-box stores. They consisted of two Targets, one K-Mart, and one Giant Eagle. Fried applied

downward adjustments based upon difference in location, arriving at an average adjusted rental rate of $4.27 per square foot. In accordance with the standards for the Income Capitalization approach, Fried projected a net operating income of $374,349 per annum.

Finally, Fried developed a capitalization rate, which reflects the risks inherent in owning property for the purpose of leasing it on the open market. Fried averaged the capitalization rates for the leased properties used in her sales comparison approach and that she found to be comparable from the overall region (Belk's, Sears, At Home, and Walmart). Fried also considered investor surveys for large retail properties and the trends indicated by those surveys. In addition, Fried used the "band of investment method," which uses mortgage and equity data to indicate the required returns on investments. After considering the average capitalization rates under each of these methods, and the positive and negative attributes of the Property and its location, and the property taxes that would be borne by the owner during periods of vacancy, Fried arrived at a final capitalization rate of 8.81%. Fried then divided the income by the capitalization rate, concluding that the value of the Property is $4,248,418, rounded to $4,250,000, under the income approach.

In her reconciliation of these approaches, Fried gave greater weight to the Sales Comparison approach, with secondary weight assigned to the Income

Capitalization approach. Fried arrived at a final value of $4,000,000 as of January 1, 2020.

We conclude that Fried's testimony was reliable and competent. Thus, Lowe's offered substantial, compelling evidence to support its proffered $4,000,000 value.

In so doing, we find that the criticisms that the Board and the PVA leveled at her to be invalid and inapposite. The most significant attack is that Fried made no adjustments for the four properties for sale as to their vacant status alone. The Board and the PVA complained of Fried's use of "dark-store" (or vacant) properties in comparison. (Appellees Brief, p. 3, *et seq.*) This argument is a red herring. And the cited source for the PVA's argument is a guidebook, not precedent from Kentucky or persuasive authority from other Courts outside the Commonwealth. It is unsupported both in the law and in practice. Of course, while there is no vacancy requirement, buildings would not continue to be occupied after a sale (unless they were sold pursuant to a lease). The PVA's assertion that empty properties indicate a lack of demand fails to account for the realities of normal sales gaps. The definition of fair cash value presumes a sale of the property. And, in the case of a sale of a big-box, retail property like Lowe's, the calculation of the fair cash value would normally include comparables of unoccupied and unleased property. Fried's opinion, that an occupied and operating

-33-

big-box store is worth only as much as it could be sold as a vacant store to a different and willing buyer, is precisely what is required under the Kentucky Constitution. KY. CONST. § 172 (basing assessments on values "estimated at the price it would bring at a fair voluntary sale").

At oral argument, the PVA complained that Fried failed to make adjustments to account for vacant sale. This assertion misapprehends the very nature and concept of adjustments, which are to be made for the purpose of rendering properties more and truly comparable. Vacant sales compared to other sales require no adjustments. Adjustments only enter the picture where sales are being compared to leases. The whole point is that adjustments must be made for comparing leases to actual sales or properties that are not leased; they are not needed where the comparisons of sales to sales are true.

In taking the position that sales of operational stores are preferred to vacant or distressed sales for purposes of comparison, the Board also cited cases from other jurisdictions. Importantly, there is no Kentucky precedent to support the argument that occupied, leased stores such as those used by Mays are superior comparables versus the vacant stores for sale used by Fried. Built-to-suit, owner-occupied, non-leased stores are not unicorns. Fried quite properly found such comparables and used them.

Thus, the Board's out-of-hand dismissal is unwarranted. Indeed, this assumption is no better supported than Mays' conclusion that the Property should be valued as if a lease were in place. The Board needed to account for its determination that similar vacant stores are not valid for comparison purposes, but somehow leased stores are where there is no lease of the subject Property. In the absence of any such analysis, the Board's decision to rely on the PVA's value, or Mays' valuation, over Fried's was arbitrary and not supported by substantial evidence.

Moreover, Fried did not solely use sales of vacant properties. She also relied on leased properties for both her Sales Comparison and Income Capitalization Approaches. But unlike Mays, she made the necessary adjustments to make the comparisons valid. As stated above, Fried properly discounted the value of any theorized lease in her adjustments.

The Board also criticized Fried's comparables because it deemed most of them to be in a different investment class and occupied by second-generation users, who the Board declared to be less creditworthy.[11] This argument finds no support in Kentucky law. In *Sears, Roebuck & Co. v. Boone County Board of Assessment Appeals*, 715 S.W.2d 888, 889 (Ky. App. 1986), we specifically held,

---

[11] But in contrast, Mays relied on comparables using build-to-suit leases, which are also not applicable to the Property as discussed above in *Wilgreens*.

in binding precedent, that the favorable financing terms of a sale did not render it incomparable. *Id.* at 889. Otherwise, the analysis would value the taxpayer's financing arrangements rather than the property itself, in violation of the Kentucky Constitution § 172. *Id.* at 890. Thus, contrary to the PVA's argument about K-Mart and bankruptcy, otherwise comparable property is not deemed less so because of financing and credit. Moreover, K-Mart was the tenant, and not the owner, in the PVA's oral argument. The vacant property was still possessed by the owner and still subject to a free sale.

Continuing in its criticism of Fried, the Board also found fault with Fried's choice of comparable properties for her Income Capitalization approach, noting that three of the four properties were parts of larger indoor malls or shopping centers and not free-standing, big-box stores. The Board further derided Fried's net-operating-income analysis, noting that it failed to account for replacement reserves. The Board also took issue with Fried's choice of capitalization rate, which was higher than that of the average of the comparables she used. [12]

---

[12] The Board also pointed out that both Fried and Mays incorrectly stated that the Property is located within the Lexington Metropolitan Statistical Area ("MSA"). The Board noted that Mount Sterling is actually outside of the Lexington MSA. Curiously, however, the Board weighed this mutual error more heavily against Fried than Mays.

First, no two properties are identical, and there will always be some differences when making comparisons. Second, although these relatively minor points may be valid considerations for applying adjustments, the Board did not explain how these lessor factors could reasonably cause Fried's entire analysis to fail. More important, the Board did not explain how it allowed Mays' substantively flawed analysis – relying solely on a non-existent lease – to triumph over subsidiary issues with Fried's analysis. Rather, the Board appears to have simply and summarily chosen to give weight and credibility to Mays' methods and calculations while disparaging Fried's. While the Board has the authority to make decisions regarding the weight, credibility, and sufficiency of the testimony, it can neither find substantial evidence where there is none nor ignore the substantial evidence presented.

KRS 132.191 sets forth the acceptable valuation methods, including but not limited to, the Cost Approach, and the Sales Comparison and Income Capitalization Approaches used by Fried and Mays. Because all of these methods are generally acceptable, the Board retains the prerogative to choose the most appropriate and reliable approach to valuation under the circumstances. *Jefferson Cnty. Prop. Valuation Adm'r v. Oxford Props., Inc.*, 726 S.W.2d 317, 319 (Ky. App. 1987). Where the fact-finder's decision is to deny relief to the party with the burden of proof or persuasion, the issue on appeal becomes whether the evidence

-37-

in that party's favor is so compelling that no reasonable person could have failed to be persuaded by it. *McManus v. Kentucky Retirement Systems*, 124 S.W.3d 454, 458 (Ky. App. 2003).

While the standard of review is deferential, it is nonetheless an existing standard. A rubber stamp it is not. Agencies and Boards, as well as Courts, are to base their decisions upon the relevant, competent, and reliable evidence that is received. When substantial, supporting evidence is lacking, such as with the PVA assessment and Mays' analysis and opinions, Courts cannot affirm. And conversely, when substantial evidence is given, such as Fried's analysis and conclusions, Courts are not free to ignore it or reject it summarily.

Here, as stated above, Lowe's met its burden under the law of showing that the PVA's and Mays' valuations were so flawed, inherently contradictory, and violative of both the statute and the Constitution that they simply cannot qualify as substantial evidence. *Schore Co.*, 736 S.W.2d at 30. That leaves Fried's opinion and analysis as the only evidence that remained. The Board had already accepted it, qualified her as an expert, and found that her analysis was conducted consistently with the accepted appraisal standards. As no reasonable person could have refused the evidence under these circumstances, the Board was required to adopt it.

Further, the evidence in Lowe's favor is so compelling that no one could reasonably have failed to be persuaded by it. *McManus*, 124 S.W.3d at 458. At oral argument, counsel for the PVA acknowledged that Fried's testimony met the "compelling" standard.[13] While we have considered the option of remanding the case to the Circuit Court, with instructions to remand to the Board, for further hearing, we do not find this to be an acceptable alternative. The Board has already had the hearing, and both parties submitted their evidence. Judicial economy would not be served by repeating the entire exercise. And remanding the case to give the PVA another shot at bringing its proof in conformity with authority would be unfair and prejudicial to Lowe's. The PVA has already brought its considerable resources to bear against this taxpayer, and it has lost this battle.

### III. Conclusion

In sum, Kentucky law does not mandate that fair cash value always must be based on the hypothetical sale of a vacant and unoccupied property. However, the valuation must be based upon "the price it would bring at a fair voluntary sale[.]" KY. CONST. § 172. This clearly does not mean the value of the Property to Lowe's or the value of special arrangements that are not in existence on the date of valuation.

---

[13] However, she nonetheless claimed that it was not "substantial."

The Board, and then the Circuit Court, no doubt endeavored to make good decisions. However, they both failed in their task to determine whether substantial, competent evidence was presented to uphold the PVA's valuation.

Mays' assumption is not supported by the evidence and does not comply with the constitutional or statutory requirements. Mays valued the property based upon a hypothetical lease that does not exist. He chose his comparables and applied adjustments based upon this unsupported assumption. The result is an inflated value that does not reflect the fair cash value of the Property either as it exists or as it could have been sold as of the valuation date. Consequently, Mays' report and testimony could not constitute substantial evidence on which the Board could base its decision under the law.

This leaves Fried's report and testimony as the only competent evidence upon which the Board could have reasonably relied. We conclude that Fried's assumptions and analysis are supported by the substantial evidence applicable to this Property and comply with the constitutional requirement that assessments must be based on the fair cash value of the Property, and no reasonable body should have failed to adopt them.

Accordingly, we reverse the judgment of the Montgomery Circuit Court upholding the decision of the Board of Tax Appeals with respect to the PVA's assessment of the Property. We remand the case back to the Circuit Court

to remand the matter back to the Board to find the proper value of the Property to be $4,000,000, consistent with the only substantial, compelling evidence of record.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEES: |
|---|---|
| Machen Picard Bihrle<br>Minneapolis, Minnesota | Keith Craycraft<br>Montgomery County Attorney<br>Mount Sterling, Kentucky |
| ORAL ARGUMENT FOR<br>APPELLANT: | Erin E. Musgrave<br>Assistant Montgomery County |
| Benjamin A. Blair[14]<br>Indianapolis, Indiana | Attorney<br>Lexington, Kentucky |
| Faith Maggard<br>Washington, DC | ORAL ARGUMENT FOR<br>APPELLEES: |
| | Erin E. Musgrave<br>Lexington, Kentucky |

---

[14] At oral argument, and after Lowe's initial argument was complete, the PVA objected to Mr. Blair's appearance as he is not licensed as an attorney in Kentucky, and Ms. Bihrle, a licensed Kentucky attorney, was not present with him. He explained that Ms. Birhle was on maternity leave, and co-counsel Ms. Maggard was licensed in Kentucky. He emphasized that he was part of this case since its inception, through the litigation at the Board and the Circuit Court. He stated that he checked with the Kentucky Bar Association and was assured that his appearance with Ms. Maggard was acceptable. We note that we had granted his motion to appear *pro hac vice*. While we accept the oral explanation of Ms. Birhle's absence and Ms. Maggard's appearance, we note that the better practice would have been to give professional courtesy notice to both the Court and counsel for the PVA of the status of counsel at oral argument in advance of that argument.